**CYBERSPACE, COMMUNICATIONS, INC., Arbornet, Marty Klein, Aids Partnership of Michigan, Art on The Net, Mark Amerika of Alt–X, Web Del Sol, Glad Day Bookshop, Inc., Litline, American Civil Liberties Union, Plaintiffs,**

v.

**John ENGLER, Governor of the State of Michigan, and Jennifer M. Granholm, Attorney General of the State of Michigan, Defendants.**

**No. 99–CV–73150.**

United States District Court, E.D. Michigan, Southern Division.

July 29, 1999.

738

Andrew A. Nickelhoff, Detroit, Kary L. Moss, Detroit, Michael J. Steinberg, Detroit, MI, for plaintiff.

Thomas R. Wheeker, Michigan Department of Attorney General, Lansing, MI, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF [1]

TARNOW, District Judge.

In 1978, the Michigan Legislature enacted a statute to protect children by prohibiting the distribution of obscene materials to children of this state. 1978 Public Act 33, M.C.L. 722.671 *et seq.*; M.S.A. 25.254(1) *et seq.* In an effort to modernize the statute in light of current technology (and in an effort to make other improvements in the operation of the statute), the Legislature amended the statute by means of 1999 Public Act 33 (hereinafter referred to as the "Act"). The Act primarily attempts to do two things: 1) it adds criminal prohibitions against using computers or the Internet to disseminate sexually

---

1. Law Clerk Philip M. Cavanagh provided quality research assistance.

explicit materials to minors, and, 2) it changed the language of the statute so that the statute prohibits the dissemination of "sexually explicit" materials to minors rather than "obscene" materials.

The Act, amendments to M.C.L. 722.671 *et seq.*, was signed by Defendant, John Engler, the Governor of Michigan on June 1, 1999. It is set to take effect August 1, 1999. Plaintiffs represent a broad spectrum of organizations and individuals who use the Internet to communicate, disseminate, display and access a broad range of speech and ideas. Plaintiffs include speakers, content providers, and/or Internet service providers (ISPs).

Plaintiffs claim that the Act will adversely impact them because it is unconstitutionally vague or overbroad. They maintain it will have a chilling effect on their freedom of speech under the First Amendment. Plaintiffs communicate online both within and outside of the state of Michigan. Their speech is accessible within and outside of the state of Michigan. For this reason, Plaintiffs further argue that the Act violates the Commerce Clause of the United States Constitution. They have requested this Court issue a preliminary injunction to enjoin the amendments to the statute.

## I. The Amended Statute

The central prohibition contained in the amended act is found in M.C.L. 722.675(1); M.S.A. 25.254(5)(1):

A person is guilty of disseminating sexually explicit matter to a minor if that person does either of the following:

(a) Knowingly disseminates to a minor sexually explicit visual or verbal material that is harmful to minors;

(b) Knowingly exhibits to a minor a sexually explicit performance that is harmful to minors.

The Act redefines obscenity as "sexually explicit matter"[2]. The Act makes it unlawful to communicate, transmit, display, or otherwise make available by means of the Internet or a computer, computer program, computer system, or computer network this sexually explicit matter. M.C.L. 722.673; M.S.A. 25.254(3). Violation of the statute is a felony punishable by up to two years in prison and a fine of $10,000. 722.675(5); M.S.A. 25.254(5)(5)[3]. Finally, the Act threatens criminal sanctions "if the violation originates, terminates, or both originates and terminates" in the State of Michigan. (M.C.L.722.675(8), M.S.A. 25.254(5)(8)).

The 1999 P.A. 33 amendments were specifically intended to apply the pre-existing statute's prohibition on the dissemination of sexually explicit matter to communication over the Internet. Because of the anonymous and borderless nature of the Internet, Plaintiffs fear the amendments will subject them to criminal prosecution for the expression of protected speech. They filed suit challenging the Act. Plaintiffs then asked to enjoin the Act's enforcement scheduled to begin August 1, 1999.

A hearing was held on the Motion for a Preliminary Injunction on July 22, 1999. The Court wishes to thank the parties for the thoroughness and quality of the arguments presented.

The following constitutes the Court's findings of fact and conclusions of law:

## II. The Internet

Based on the testimony presented at the hearing on the preliminary injunction motion, based on the parties' stipulation of facts, and based on the factual findings of other federal courts, including the United States Supreme Court,[4] the Court finds

---

2. As defined in M.C.L. 722.673; M.S.A. 25.254(3), as amended.

3. Plaintiffs here do not challenge the Act to the extent that it applies to obscenity. This

would allow the Court to enjoin the amendments without nullifying the original statute.

4. As support for this Court to accept the parties' stipulation of facts, the parties rely on the

the following to accurately describe the Internet:

### The Nature of the Internet

1. The Internet is a decentralized, global communications medium that links people, institutions, corporations and governments around the world. *ACLU,* 929 F.Supp. at 831; *Pataki,* 969 F.Supp. at 164; *Johnson,* 4 F.Supp.2d at 1031.

2. The Internet is a giant computer "network of networks" which interconnects innumerable smaller groups of linked computer networks and individual computers offering a range of digital information including text, images, sound and video, *Reno I,* 117 S.Ct. at 2334; *Pataki,* 969 F.Supp. at 164; *Johnson,* 4 F.Supp.2d at 1031; *Reno II,* 31 F.Supp.2d at 481.

3. While estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 159 countries, and over 100 million users. *ACLU v. Reno,* 929 F.Supp. at 831; *Johnson,* 4 F.Supp.2d at 1031. The amount of traffic on the Internet is doubling approximately every 100 days.

4. Content ranges from academic writings, to art, to humor, to literature, to medical information, to music, to news, to sexually oriented material. *Pataki,* 969 F.Supp. at 164; *Reno I,* 117 S.Ct. at 2335.

5. Sexually explicit material is available on the Internet; however, it is not "the primary type of content on this new medium." *ACLU v. Reno,* 929 F.Supp. at 844; *Pataki,* 969 F.Supp. at 164; *Reno II,* 31 F.Supp.2d at 484.

6. In addition, at any one time, the Internet serves as the communication medium for tens of thousands of global conversations, political debates, and social dialogues. *Pataki,* 969 F.Supp. at 165–166.

7. The Internet is distinguishable in important ways from traditional media. It is a revolutionary medium that is dramatically altering traditional views of communications and community, *See ACLU v. Reno,* 929 F.Supp. at 843–844. No single organization controls any membership in the Web, nor is there any centralized point from which individual Web sites or services can be blocked. *Reno I,* 117 S.Ct. at 2336; *Reno II,* 31 F.Supp.2d at 484.

8. The Internet is a global medium. *Reno II,* 31 F.Supp.2d at 482. At least 40% of the content of the Internet originates abroad. *Reno I,* 117 S.Ct. at 2334; *Reno II,* 31 F.Supp.2d at 484.

9. The Internet also differs from traditional media in that it provides users with an ability to interact with other users and with content. *ACLU v. Reno,* 929 F.Supp. at 843–44. Unlike radio or television, communications on the Internet do not "invade" an individual's home or appear on one's computer screen unbidden. *Id.* at 844. Rather, the receipt of information on the Internet "requires a series of affirmative steps more deliberate and directed than merely turning a dial." *Reno I,* 117 S.Ct. at 2336 (*quoting ACLU v. Reno,* 929 F.Supp. at 845).

10. Because the Internet presents extremely low entry barriers to publishers and distributors of information, it is an especially attractive method of communicating for non-profit and public interest groups. *ACLU v. Reno,* 929 F.Supp. at 843; *Reno II,* 31 F.Supp.2d at 482.

11. Any person or organization with a computer connected to the Internet can "publish" information. *Reno I,* 117 S.Ct. at 2335.

12. Also, unlike radio, television, newspapers and books, the Internet is not ex-

following cases as cited in the stipulation: *Reno v. American Civil Liberties Union ("Reno I"),* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), *aff'g American Civil Liberties Union ("ACLU") v. Reno,* 929 F.Supp. 824 (E.D.Pa.1996); *ACLU v. Johnson,* 4 F.Supp.2d 1029 (D.N.M.1998), appeal docket-

ed, No. 98–2199 (10th Cir. Aug. 7, 1998); *American Libraries Ass'n v. Pataki,* 969 F.Supp. 160 (S.D.N.Y.1997); *ACLU v. Reno ("Reno II"),* 31 F.Supp.2d 473 (E.D.Pa.1999), appeal docketed, No. 99–1324 (3rd Cir. April 26, 1999).

clusively, or even primarily, a means of commercial communication. *ACLU v. Reno,* 929 F.Supp. at 842. In sum, the Internet is "a unique and wholly new medium of worldwide human communication." *Reno I,* 117 S.Ct. at 2334 (*quoting ACLU v. Reno,* 929 F.Supp. at 844).

### How Individuals Access the Internet

13. Individuals may obtain easy access to the Internet in particular through many educational institutions, businesses, libraries, and individual communities who maintain computer networks linked directly to the Internet and provide account numbers and passwords enabling users to gain access to the network. *Reno I,* 117 S.Ct. at 2334; *Pataki,* 969 F.Supp. at 164–165.

14. Internet service providers ("ISPs"), such as plaintiffs Cyberspace Communications and Arbornet.org, offer their subscribers modem access to computers or networks maintained by the ISP which are linked directly to the Internet. *ACLU v. Reno,* 929 F.Supp. at 832–33; *Reno I,* 117 S.Ct. at 2334; *Pataki,* 969 F.Supp. at 165; *Reno II,* 31 F.Supp.2d at 482.

### Ways of Communicating and Exchanging Information on the Internet

15. Most users of the Internet are provided with a username, password and electronic mail (or "e-mail") address that allow them to sign on to the Internet and to communicate with other users. *Pataki,* 969 F.Supp. at 165.

16. Many usernames are pseudonyms or pen names that often provide users with a distinct online identity and help to preserve their anonymity. An e-mail sender directs his or her message to a "logical rather than geographic address." *Id.*

17. The username and e-mail address are the only indicators of the user's identity. Persons communicating with the user will know them only by their username and e-mail address (unless the user reveals other information about herself through her messages). *Id.* Anonymity of the communicant is both important and valuable to the free exchange of ideas and information on the Internet.

18. Once an individual signs on to the Internet, there are a wide variety of methods for communicating and exchanging information with other users. *See generally Reno I,* 117 S.Ct. at 2334–35; *ACLU v. Reno,* 929 F.Supp. at 834–38; *Shea,* 930 F.Supp. at 927–30; *Pataki,* 969 F.Supp. at 165; *Reno II,* 31 F.Supp.2d at 482–483. The primary methods are:

*E–Mail:* "E-mail enables an individual to send an electronic message—generally akin to a note or letter—to another individual or to a group of addresses." *Reno I,* 117 S.Ct. at 2335; *Pataki,* 969 F.Supp. at 165.

*Online Discussion Groups:* Thousands of discussion groups have been organized by individuals, institutions, and organizations on many different computer networks and cover virtually every topic imaginable—creating a new, global version of the village green. The three most common methods for online discussion are mail exploders, USENET newsgroups, and chat rooms.

*Mail Exploders:* Mail exploders, also called mailing lists, allow online users to subscribe to automated mailing lists that disseminate information on particular subjects. Subscribers send an e-mail message to the "list," and the mail exploder automatically and simultaneously sends the message to all of the other subscribers on the list. Subscribers can reply to the message by sending a response to the list. *Reno I,* 117 S.Ct. at 2335. Users of mailing lists typically can add or remove their names from the list automatically, with no direct human involvement. *ACLU v. Reno,* 929 F.Supp. at 834; *Pataki,* 969 F.Supp. at 165–166.

*USENET Newsgroups:* "USENET" newsgroups are a popular set of discussion groups arranged according to subject matter and automatically disseminated "using *ad hoc,* peer to peer connections between approximately 200,000 computers ...

around the world." *Reno I*, 117 S.Ct. at 2335 (*quoting ACLU v. Reno*, 929 F.Supp. at 834–35); *see also Pataki*, 969 F.Supp. at 166. Users may read or send messages to most newsgroups without a prior "subscription," and there is no way for a speaker who posts an article to most newsgroups to know who is reading her message. *Id.*

*Chat Rooms:* "Chat rooms" provide additional online discussion forums that allow users to engage in real time dialogue with one or many other users by typing messages and reading the messages typed by others participating in the chat, analogous to a telephone party line, using a computer and keyboard rather than a telephone. *Reno I*, 117 S.Ct. at 2335; *ACLU v. Reno*, 929 F.Supp. at 835. There are thousands of different chat rooms available "in which collectively tens of thousands of users are engaging in conversations on a huge range of subjects." *Reno I*, 117 S.Ct. at 2335 (*quoting ACLU v. Reno*, 929 F.Supp. at 835); *Pataki*, 969 F.Supp. at 166.

*The World Wide Web:* The Web allows users to publish documents, also called "Web pages," that can then be accessed by any other user in the world. *See generally Reno I*, 117 S.Ct. at 2335, and 929 F.Supp. at 836–38; *Shea*, 930 F.Supp. at 929–30; *Pataki*, 969 F.Supp. at 166; *Reno II*, 31 F.Supp.2d at 484. The Web comprises millions of separate "Web sites" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create her own Web page, view Web pages posted by others, and then read text, look at images and video, and listen to sounds posted at these sites. *Pataki*, 969 F.Supp. at 166. There are Web sites now by large corporations, banks, brokerage houses, newspapers and magazines, and government agencies and courts. *Id.*

19. There are a number of different ways that Internet users can browse or search for content on the Web: by specific address ("URL") or by "search engines," which are available free of charge to help users navigate the Web, *Reno I*, 117 S.Ct. at 2335; *Pataki*, 969 F.Supp. at 166; or by "linking" from one Web page to another. *Reno II*, 31 F.Supp.2d at 483. Almost all Web documents contain "links," which are short sections of text or image that refer and link to another Web document. *Reno I*, 117 S.Ct. at 2335; *Pataki*, 969 F.Supp. at 166–167; *Reno II*, 31 F.Supp.2d at 484. When selected by the user, the "linked" document is automatically displayed, wherever in the world it is actually stored. *Reno I*, 117 S.Ct. at 2335; *Pataki*, 969 F.Supp. at 166; *Reno II*, 31 F.Supp.2d at 484. "The Web is thus comparable ... to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services." *Reno I*, 117 S.Ct. at 2335.

20. "Taken together, these tools constitute a unique medium—known to its users as 'cyberspace'—located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet." *Reno I*, 117 S.Ct. at 2334–35.

21. Once a provider posts content on the Internet, it is available to most other Internet users worldwide. *ACLU v. Reno*, 929 F.Supp. at 844; *Pataki*, 969 F.Supp. at 167; *Johnson*, 4 F.Supp.2d at 1032.

22. For the vast majority of communications over the Internet, including all communications over the Web, by e-mail, newsgroups, mail exploders, and chat rooms, it is not technologically possible for a speaker to determine the age of a user who is accessing such communications. *See Reno I*, 117 S.Ct. at 2336–37 (*quoting ACLU v. Reno*, 929 F.Supp. at 845) ("There is no effective way to determine the identity or the age of a user who is accessing material through e-mail, mail exploders, newsgroups, or chat rooms."); *Shea*, 930 F.Supp. at 941 ("for the vast majority of applications and services available on the Internet, a user has no way of communicating ... with certainty that the

content will not reach a person under eighteen . . . ."); *Reno II*, 31 F.Supp.2d at 495 ("the nature of the Web and the Internet is such that Web site operators and content providers cannot know who is accessing their sites, or from where, or how old the users are, unless they take affirmative steps to gather information from the user, and the user is willing to give them truthful responses.").

Thus, these categories of speakers either must make their information available to all users of the Internet, including users who may be minors, or not make it available at all. This is also true for non-Web-based communications by e-mail, newsgroups, mail exploders, and chat rooms.

For Web speakers, the vast majority cannot now determine the age of people accessing their speech and many could not technologically change their site even to request information on age. Also, even for those Web sites, or other Internet speakers, who ask readers to state their age, there is no reasonable method by which the speaker can determine the reliability of that information.

### The Availability of User–Based Filtering Programs

24. There are a variety of options available to parents and other users who wish to restrict access to online communications that they might consider unsuitable for minors. *See generally Reno I*, 117 S.Ct. at 2337, and *ACLU v. Reno*, 929 F.Supp. at 838–42; *Shea*, 930 F.Supp. at 931–34.

25. First, there are a variety of user-based software products that allow users to block access to sexually explicit materials on the Web, to prevent minors from giving personal information to strangers by e-mail or in chat rooms, and to keep a log of all online activity that occurs on the home computer. *Reno I*, 117 S.Ct. at 2337. "The market for this type of [user-based] software is growing, and there is increasing competition among software providers to provide products." *ACLU v. Reno*, 929 F.Supp. at 839.

26. Second, large commercial online services such as America Online provide features to prevent minors from accessing chat rooms and to block access to certain newsgroups based on keywords, subject matter, or specific newsgroup. *Reno I*, 117 S.Ct. at 2336; *Johnson*, 4 F.Supp.2d at 1033; *Reno II*, 31 F.Supp.2d at 492.

27. Third, the large online services such as America Online also offer parental control options free of charge to their members. America Online has established an online area designed specifically for children. The "Kids Only" parental control feature allows parents to establish an America Online account for their children that accesses only the "Kids Only" channel on America Online. *ACLU v. Reno*, 929 F.Supp. at 842.

### The Interstate Nature of Online Communication

28. The Internet is wholly insensitive to geographic distinctions, and Internet protocols were designed to ignore rather than document geographic location. *Pataki*, 969 F.Supp. at 167, 170; *Johnson*, 4 F.Supp.2d at 1032.

29. While computers on the network do have "addresses," they are digital addresses on the network rather than geographic addresses in real space. The majority of Internet addresses contain no geographic indicators. *Pataki*, 969 F.Supp. at 170.

30. Like the nation's railways and highways, the Internet is by nature an instrument of interstate commerce. *Pataki*, 969 F.Supp. at 173; *Johnson*, 4 F.Supp.2d at 1032. Just as goods and services travel over state borders by truck and train, information flows freely across state borders on the Internet. *Pataki*, 969 F.Supp. at 173.

31. It is this characteristic which has earned the Internet the nickname, "the information superhighway." *Pataki*, 969 F.Supp. at 161.

32. In fact, no aspect of the Internet can feasibility be closed to users from an-

other state. *Pataki*, 969 F.Supp. at 171; *Johnson*, 4 F.Supp.2d at 1032. There is no way to stop or bar speech at Michigan's border.

33. An Internet user who posts a Web page cannot prevent Michiganians or Oklahomans or Iowans from accessing that page. They will not even know the state residency of any visitors to that site, unless the information is voluntarily (and accurately) given by the visitor. *Pataki*, 969 F.Supp. at 171; *Reno II*, 31 F.Supp.2d at 495; *Johnson*, 4 F.Supp.2d at 1032.

34. Participants in chat rooms and on-line discussion groups also have no way of knowing when participants from a particular state have joined the conversation. *Id; Johnson*, 4 F.Supp.2d at 1032.

35. Because most e-mail accounts allow users to download their mail from anywhere, it is impossible for someone who sends an e-mail to know with certainty where the recipient is located geographically. *Pataki*, 969 F.Supp. at 171.

36. In addition, the Internet is a redundant series of linked computers over which information often travels randomly. *Pataki*, 969 F.Supp. at 164, 171. Thus, a message from an Internet user sitting at a computer in New York may travel via one or more other states—including Michigan—before reaching a recipient who is also sitting at a computer in New York. *Id; Johnson*, 4 F.Supp.2d at 1032.

37. There is no way for an Internet user to prevent his or her message from reaching residents of any particular state. *Pataki*, 969 F.Supp. at 171; *Johnson*, 4 F.Supp.2d at 1032. Similarly, "[o]nce a provider posts its content on the Internet, it cannot prevent that content from entering any community." *Reno I*, 117 S.Ct. at 2336 (*quoting ACLU v. Reno*, 929 F.Supp. at 844).

## III. Standing

 Defendants argue that the threshold issue before the court is that the Plaintiffs lack standing to bring this request for injunctive relief. A plaintiff must have standing to bring or pursue a claim in federal court. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Standing is a question of judicial power, and it is the threshold question in every federal case. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

 Standing encompasses at least three factors:

> 1) an injury in fact—i.e., an injury which is concrete and actual or imminent, not merely speculative or hypothetical;
>
> 2) a causal relationship between the injury and the challenged conduct; and
>
> 3) a likelihood that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

"Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending'." *Id.* at 564, n. 2, 112 S.Ct. at 2138, n. 2. (Emphasis in original).

Defendants claim that to address these issues raised by plaintiffs is to issue an advisory opinion because the statute is yet to go into effect and Plaintiffs have not yet been injured in fact.[5]

 Under the criteria outlined by the Supreme Court in *Lujan*, the plaintiffs have standing, because an alleged injury is '*certainly* impending', if the statute takes effect and the material they disseminate is deemed "sexually explicit". No one should have to go through being arrested for a

---

**5.** Defendants do not challenge that Plaintiffs satisfy the 2nd and 3rd criteria needed for standing as set forth *Lujan.*

felony, publicly shamed, and pay for a defense only to have a court find that the newly enacted statute is unconstitutional. This can, and should, be determined before such injury occurs. Such a challenge can be brought by those that may be accused, or injured in fact, by such a statute.

**Plaintiffs include:**

— Cyberspace Communications ("Cyberspace") is a tax exempt Michigan non-profit corporation. Cyberspace maintains a free public access Internet service called "Grex," at the Internet address: Cyberspace.org. Currently approximately 29,000 users access Grex through the World Wide Web or through a bank of dial-in modems located in Ann Arbor, Michigan.

— Arbornet is a tax-exempt Michigan non-profit corporation. Arbornet runs M-Net, "America's first public access Unix system." M-Net began operations on June 16, 1983. Arbornet's users obtain services such as conferences, e-mail, chat, and Internet access, generally at no cost.

— Marty Klein is a licensed Marriage and Family Therapist in Palo Alto, California. In addition to his practice as a therapist working with individuals and couples, Dr. Klein is also the author of numerous books and articles about human sexuality. Dr. Klein has maintained a Web site, located at *www.Sexed.org.*

— Aids Partnership of Michigan ("Aids Partnership") maintains a Web site, at the address *www.aidspartnership.org,* which contains information regarding HIV and Aids, including the most recent scientifically available facts about the methods of transmitting HIV and testing for HIV and Aids, and methods of safer sex practices.

— Art on the Net is a non-profit organization with an international artist site ("art.net") on the Web. Art on the Net assists over 125 artists from all over the world in maintaining online studios.

— Mark Amerika is a critically acclaimed writer and publisher of Alt–X, a Web site containing original literary works published only online, reviews of new media art and theory, original online art projects. Alt–X has been called "the literary publishing model of the future."

— Web Del Sol is a voluntary association which functions as a dynamic, literary arts complex on the Internet. Its Web address is *www.webdelsol.com.* Web Del Sol was founded as a forum for the collaborative literary efforts of dozens of editors and writers, and hosts a vast array of poems, articles, essays, and photography, as well as a bulletin board and a chat room.

— Glad Day Bookshop is a bookstore located in Boston, Massachusetts, that specializes in gay and lesbian books and also maintains a Web site on which visitors may obtain information about Glad Day Bookshop and the books it makes available. Its Web site is located at *www.tiac.net/users/gladday.*

— Litline a nonprofit web site set up by the Counsel for Literary Magazines and Presses (CLMP) to provide Internet content for independent literary presses, journals, and organizations. Its Web address is *www.litline.org.* Litline mainly provides free design and hosting services to eleven independent literary journals and six independent presses, none of which could otherwise afford to go online.

— American Civil Liberties Union ("ACLU") is a national civil rights organization. The ACLU maintains a Web site on which it posts civil liberties information and resources, including material about arts censorship, obscenity laws, discrimination against lesbians and gays, and reproductive choice. In addition, the ACLU hosts unmoderated online discussion groups that allow citizens to discuss and debate a variety of civil liberties issues.

All the Plaintiffs justifiably fear prosecution. They have stated that they disseminate on the Internet sexually explicit material which arguably could be deemed "harmful to minors". Absent an injunction they must self-censor their speech on the Internet or else risk prosecution under the

Act. These allegations of harm are sufficient to confer standing in this action for declaratory and injunctive relief. "In the context of threats to the right of free expression," it is not necessary "that an individual first be exposed to prosecution in order to have standing to challenge a statute which is claimed to deter the exercise of constitutional rights." *Briggs v. Ohio Elections Comm'n,* 61 F.3d 487, 492 (6th Cir.1995) (citations omitted). These allegations of harm also sufficiently support a request for a preliminary injunction. *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1078–79 (6th Cir.1994). *See* also *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The Plaintiffs in this case have standing and are entitled to a preliminary injunction, because the Act poses a threat to their rights under the U.S. Constitution. *See* also, *ACLU v. Johnson,* 4 F.Supp.2d at 1027; *ALA v. Pataki,* 969 F.Supp. 160 (S.D.N.Y.1997).

## IV. First Amendment Challenge

The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law ... abridging freedom of speech." The prohibitions of the First Amendment extend to the several States through the Fourteenth Amendment.

Defendants argue *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) and *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), for the proposition that 'obscenity' is not protected by the First Amendment. In *Ginsberg,* the Supreme Court held that a state could prohibit the dissemination to minors of sexually explicit materials which would not be legally obscene with regard to an adult. In *Miller,* the Supreme Court stated:

> This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.

*Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); (citations omitted).

> We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. *See Interstate Circuit, Inc. v. Dallas,* supra, 390 U.S., [676]at 682—685, 88 S.Ct., [1298]at 1302—1305[ 20 L.Ed.2d 225 (1968)]. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

*Id.* at 23–24, 93 S.Ct. at 2614–15.

Defendants argue that the Act comports to the specifications of *Ginsberg* and *Miller;* therefore, the Act is constitutional. Yet in these cases, the 'materials' referenced were magazines and brochures, respectively. Magazines or brochures can be brown bagged or hidden in the backroom of purveyors. With the Internet, you would have to 'close the bookstore' because the disseminator and the recipient are not face to face. A magazine can be regulated or censored by the county in which it is located. A person's age can be verified because that person is physically there, and the disseminator can logically be held responsible for conveying "sexually explicit matter" to a minor. The Internet does not distinguish between minors and adults in their audience. To comply with the Act, a communicant must speak only in language suitable for children. Even under the guise of protecting minors, the government may not justify the complete suppression of constitutionally protected speech because to do so would "burn the

house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 525, 1 L.Ed.2d 412 (1957).

The Internet is cyberspace, or an international network of computers. It is virtually impossible to prevent the content of messages from being read by someone under 18. The only way to ascertain an individuals age would be to require submission of a driver's license, birth certificate or some other form of identification. Considering a website may receive ten to a million plus "hits" a day, and many of these websites are established and maintained by even just one publisher; the impossibility of identification checking is understood. With the imposition of the government policing speech and deciding what is acceptable; a user, publisher, disseminator or communicant is faced with a Hobson's choice [6] of shutting down their website (or whatever vehicle of information exchange), or risk prosecution for exercising protected speech.

The Act itself may in fact pass constitutional muster as a permitted regulation of obscenity, as it is quite similarly worded as those statutes upheld by the Supreme Court in *Miller* and *Ginsberg*. Defendant argues. that a state does have the police power to regulate obscenity within their borders. This is true, but proper focus centers on this Public Act's impact on the Internet. The Internet is an international free flow of ideas and information. Enforcement of this Act would stifle one of the cornerstones of American Society—what Thomas Jefferson called "The Marketplace of Ideas."

■ The amended statute at issue limits the receipt and communication of information through the Internet based on the content of that information. A content-based limitation on speech will be upheld only where the state demonstrates that the limitation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) *(citing Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)).

■ This test involves three distinct inquiries: [7] (1) whether the interests asserted by the state are compelling; (2) whether the limitation is necessary to further those interests; and (3) whether the limitation is narrowly drawn to achieve those interests. *Mainstream Loudoun v. Board of Trustees of Loudoun County Library*, 24 F.Supp.2d 552, 564–65 (E.D.Va.1998).

### (1). Whether the Defendant's Interests Are Compelling

The Internet offers users quick and relatively simple access to a wide variety of information resources, products and services, and opportunities for interactive communication with millions of people through the use of a computer.... Despite the beneficial and education advantages of the Internet's growing network of information, the Internet is not without its problems. One common concern, particularly in light of the number of children who use the Internet, is the relative ease with which children can access materials that their parents might find offensive.

*House Legislative Analysis*, Senate Bill 117 (March 18, 1999)

■ The Court is quite sympathetic to the attempt of the Michigan legislature to protect minors. Society has a compelling

---

**6.** Hobson's choice: [After Thomas Hobson (1544–1631), English liveryman, from his requirement that customers, take either the horse nearest the stable door or none.] An apparently free choice that offers no actual alternative. Webster's II, New College Dictionary 526 (1995)

**7.** Defendants' sole argument was that the State of Michigan, by its police powers, could enact this statute as a constitutional ban on obscenity. Therefore, Defendants refused to recognize that the Act regulates free speech and must overcome strict scrutiny.

interest in preserving the innocence of their children. Although Defendants have failed to address this prong, there is arguably a compelling state interest to shelter our children from sexually explicit material until maturity. The Supreme Court has recognized such an interest: "We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989), *quoting Ginsberg v. New York,* 390 U.S. 629, 639–640, 88 S.Ct. 1274, 1280–81, 20 L.Ed.2d 195 (1968); and *New York v. Ferber,* 458 U.S. 747, 756–757, 102 S.Ct. 3348, 3354–55, 73 L.Ed.2d 1113 (1982).

**(2) Whether the Act is Necessary to Further Those Interests**

 To satisfy strict scrutiny, defendants must do more than demonstrate that it has a compelling interest; they must also demonstrate that the Act is necessary to further that interest. Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *see also Johnson,* 865 F.Supp. at 1439 ("[S]imply alleging the need to avoid sexual harassment is not enough [;] ... the defendant[ ] must show that the threat of disruption is actual, material, and substantial."). The defendant bears this burden because "[t]he interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno v. ACLU,* 521 U.S. 844, 117 S.Ct. 2329, 2351, 138 L.Ed.2d 874 (1997).

The Defendants failed to satisfy that the Act will further a compelling interest of the State. Plaintiffs though did submit testimony and documentation that such an Act could produce a result contrary to the desires of society. The free flow of information on the Internet enables a teenager to ask about premarital sex or sexually transmitted diseases with anonymity. Plaintiffs at the hearing read into the record an example of a teenager asking Dr. Marty Klein, a sex therapist in California and plaintiff in this case, who operates a website entitled "Ask Me Anything", about an encounter with her boyfriend that she incorrectly reasoned was not sexual intercourse. Other examples offered at the hearing include submitted transcripts of chat room discussions concerning contraceptives and abstention. Sometimes words were utilized in these discussions which could be construed as "sexually explicit" and "harmful to a minor", which theoretically could subject the disseminator to criminal prosecution.

This would have an adverse affect on public policy. With all Internet participants fearful of criminal prosecution if certain terminology is utilized, the discussions would be stifled to the point that a teenager seeking answers to curious questions concerning a subject foremost on their mind, could not find answers via this medium. Without open discussion of how to prevent being raped or birth control or abstention, there would quite possibly be greater numbers of teenage pregnancy or sexually transmitted diseases. This would be contrary to the interests of the State.

**(3) Whether the Act Is Narrowly Tailored to Achieve the Compelling Government Interests.**

 Even if defendants could demonstrate that the Act was reasonably necessary to further compelling state interests, it would still have to show that the Act is narrowly tailored to achieve those interests. The government may effectuate even a compelling interest only "by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836. The

government must "choose[s] the least restrictive means to further the articulated interest." *Id.*

*Whether Less Restrictive Means Are Available*

In *Sable*, the Court declared unconstitutional a statute banning all "indecent" commercial telephone communications. The Court found that the government could not justify a total ban on communication that is harmful to minors, but not obscene, by arguing that only a total ban could completely prevent children from accessing indecent messages. *Id.* at 128, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93. The Court held that without evidence that less restrictive means had "been tested over time," the government had not carried its burden of proving that they would not be sufficiently effective. *Id.* at 128–29, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93.

Testimony was offered by Plaintiffs through a qualified Internet expert. Dr. Lorrie Faith Cranor is Senior Technical Staff Member for Secure Systems Research for AT & T Labs–Research in Florham Park, New Jersey. She testified at the hearing that there are many less intrusive, more effective ways to screen harmful material to minors. Some of the ways or methods that this can be accomplished is through the use of currently marketed software that restrict content received. This safe and child-friendly software works off of either a 'white list' or a 'black list' theory. A white list enables a parent to program what areas of the Internet their child will be allowed to enter. A black list prevents a child from venturing into certain pre-programed areas. Dr. Cranor explained that there is software available to allow parents to filter certain words that may be offensive. Some of these are smart programs that read the context in which the word is presented, e.g. differentiating between a woman's thigh and a

chicken thigh. All of these software programs have settings that allow a parent to expand vocabulary words as a child matures. These programs are reasonably priced, usually between $20 to $30.

Many Internet Service Providers (ISPs) allow parents to regulate content with different levels of restriction. The ISP allows parents to establish separate accounts for their children depending on their ages restricting entry to only child-friendly, fun and educational places on the Internet. These areas are usually monitored by employees of the ISP and a communicant that shares offensive language will be blocked when discovered.

It was also noted at the hearing that Internet users have an unwritten code of decency and curiosity. If a communicant is being offensive to other chat room participants, (s)he will be told to stop. If the communicant persists, the offensive communicant will be 'flamed' by the group. A flame is a continuous barrage of warnings from others. The warnings can be so continuous and overwhelming that flaming can render the black-listed recipient's computer unusable online [8].

Dr. Cranor began her list of available methods or ways for which a parent can monitor the content of material to which a child receives, as having a parent sit down and explore with the child. Parental control is the most effective method in overseeing where the child ventures. This can be as simple as placing the computer in a common area of your home, like the living room, so the child can anticipate the presence of an adult. She suggested not placing the computer in the children's bedroom where they have the seclusion for unbounded exploration. A parent could also place a lock on the computer until such time as a parent can supervise the child. If the parent cannot directly supervise the child's computer usage, then set limits, much like what shows a child can and

**8.** Dr. Cranor also stated that she had done extensive research on solutions to crub unsolicited, unwanted e-mail. She labeled this junk e-mail problem as SPAM—a computer term which is not an acronym, but rather is named after a Monty Python comedy skit.

cannot watch on television. There are software programs that log all the websites so that a parent can have a record and the child knows that they have to adhere to limits. Finally, the Court takes judicial notice of the fact that every computer is equipped with an on/off switch.

The Court finds that the Act is not narrowly tailored, because less restrictive means are available to further Defendants' interests. As in *Sable*, there is no evidence that Defendants has tested any of these means over time.

In summary, Defendants have asserted a broad right to censor the expressive activity of the receipt and communication of information through the Internet with an Act that (1) addresses a compelling government interest but is not necessary to further that interest; (2) is not narrowly tailored; and, (3) fails to employ the least restrictive means available to further that interest. The Act offends the guarantee of free speech in the First Amendment and is, therefore, unconstitutional.

## V. Violation of the Commerce Clause

The Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, contains an express authorization for Congress to "regulate Commerce with foreign Nations, and among the several States ...". A "dormant" or "negative" aspect of this grant of power is that a state's power to impinge on interstate commerce may be limited in some situations. *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).

Defendants do not dispute that the Act reaches interstate commerce. Rather, they contend that the Act does not discriminate against out-of-state businesses in favor of Michigan businesses. Further, the government argues, any balancing of burdens on interstate commerce with local interests must tip in favor of the local interests asserted in the Act. These contentions fail for the reasons explained in *American Library Ass'n v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997).

First, Defendants focus solely on the line of cases which prohibit a state's discrimination against out-of-state businesses. The Commerce Clause reaches further than such discrimination alone. The Commerce Clause also operates to preclude "the application of a state statute to commerce that takes place wholly outside the State's borders, whether or not the commerce has effects within the state." *Pataki*, 969 F.Supp. at 175 (*quoting Healy v. The Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)). Although the Act by its terms regulates speech that "originates" or "terminates" in Michigan, virtually all Internet speech is, as stipulated by Defendants available everywhere including Michigan. A New York speaker must comply with the Act in order to avoid the risk of prosecution in Michigan even though (s)he does not intend his message to be read in Michigan. A publisher of a web page cannot limit the viewing of his site to everyone in the country except for those in Michigan. The Internet has no geographic boundaries. The Act is, as a direct regulation of interstate commerce, a *per se* violation of the Commerce Clause.

Moreover, even if this Court reaches the balancing of burdens on interstate commerce with local interests asserted in the Act, the Commerce Clause still requires the injunction of this Act. Assuming *arguendo* the validity of Michigan's interest in the Act, the Act will be wholly ineffective in achieving the asserted goal because nearly half of all Internet communications originate overseas. *Pataki*, 969 F.Supp. at 177. Just as in *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 566 (6th Cir. 1982), where the Sixth Circuit said: "[W]hile protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting non-resident shareholders"; so to Michigan has *no* interest in regulating out-of-state communications.

As further explained in *Pataki*, the chilling effect on Internet communications outside of Michigan greatly outweighs any putative benefit inside Michigan. The Act, and other state statutes like it, would subject the Internet to inconsistent regulations across the nation. Information is a commodity and must flow freely. On this basis alone, the Act may be preliminarily enjoined as a violation of the Commerce Clause.

## VI. Fundamental Right of Child Rearing

Although Plaintiffs did not raise the argument that parents have a liberty interest in how their own children are raised[9], nor is the Court's decision today based on that sound principal, the Court believes that there is a good argument to be considered.

As Mr. Justice Harlan wrote, dissenting in *Poe v. Ullman*, 367 U.S. 497, 551–552, 81 S.Ct. 1752, 1781, 6 L.Ed.2d 989 (1961):

(H)ere we have not an intrusion into the home so much as on the life which characteristically has its place in the home.... The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right.

\* \* \* \* \* \*

... (T)he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which,

broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

*Id.* at 542–543, 81 S.Ct., at 1776–1777.

Further, the Supreme Court explained in *Moore v. City of Cleveland, Ohio,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977):

But unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case.

*Id.* at 502, 97 S.Ct. at 1936.

\* \* \* \* \* \*

Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. [footnote omitted]. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.

*Id.* at 503–504, 97 S.Ct. at 1938.

Although it is difficult in today's society to constantly monitor the activities of children, it is still the right, and duty, of every parent to teach and mold children's concepts of good and bad, right and wrong. This right is no greater than in the confines of ones own home. A family with values will supervise their children. This includes setting limits, and either being there to enforce those limits, or utilizing the available technology to do so. With such less restrictive means to monitor the online activities of children, the govern-

---

**9.** *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626–627, 67 L.Ed. 1042 (1923) (recognizing liberty interest in raising children).

ment need not restrict the right of free speech guaranteed to adults.

## VII. Preliminary Injunction Standard

■ The district courts must consider the following four factors in determining whether or not to issue a preliminary injunction:

(1) whether the movant has a "strong" likelihood of success on the merits;

(2) whether the movant would otherwise suffer irreparable injury;

(3) whether issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Michigan High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (*quoting Sandison v. Michigan High Sch. Athletic Ass'n, Inc.,* 64 F.3d 1026, 1030 (6th Cir.1995)). These factors are not prerequisites to issuing an injunction but factors to be balanced. *United Food & Commercial Workers Union Local 1099 v. Southwest Ohio Regional Transit Auth.,* 163 F.3d 341, 347 (6th Cir. 1998).

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978); *See* also *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974) (same). Recognizing that preservation of the court's ability to exercise meaningful review may require affirmative relief in order to prevent some future irreparable injury. *See,* e.g., 11A Charles A. Wright, Arthur R. Miller, and Mary K. Kane, *Federal Practice and Procedure* § 2948 (1995).

## VIII. Applying the Standard

■ 1. The Court concludes that Plaintiffs are likely to succeed on their claims that:

(a) The Act, on its face and as applied to Plaintiffs, violates the First and Fourteenth Amendments, and the Commerce Clause of the United States Constitution.

(b) The Act violates the First and Fourteenth Amendments of the United States Constitution because it effectively bans speech that is constitutionally protected for adults.

(c) Defendants have failed to satisfy their burden to demonstrate that the Act will directly and materially advance a compelling governmental interest.

(d) Defendants have failed to demonstrate that the Act constitutes the least restrictive means of serving its stated interest.

(e) The Act violates the First and Fourteenth Amendments of the United States Constitution because it is substantially overbroad.

(f) The Act violates the First and Fourteenth Amendments of the United States Constitution because it prevents people from communicating and accessing information anonymously.

(g) The exceptions set forth in the Act fail to ameliorate the above constitutional violations. *See generally Reno,* [521 U.S. 844,] 117 S.Ct. 2329; *Pataki,* 969 F.Supp. 160.

(h) The Act violates the Commerce Clause of the United States Constitution because it regulates conduct occurring wholly outside the State of Michigan.

(i) The Act violates the Commerce Clause of the United States Constitution because it constitutes an unreasonable and undue burden on interstate and foreign commerce. *See e.g. Pataki,* 969 F.Supp. at 177–80 (noting that nature of the Internet makes the burdens on interstate and foreign commerce unreasonable in light of the limited benefits conferred locally); *ACLU v. Johnson, supra.*

(j) The Act violates the Commerce Clause of the United States Constitution

754

because it subjects interstate use of the Internet to inconsistent state regulations. *See e.g. Southern Pac. Co. v. Arizona*, 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (finding Arizona statute regulating length of trains violated Commerce Clause as it substantially impeded the free flow of commerce between the states).

(k) Plaintiffs have standing to bring this suit and to make this motion for preliminary injunction.

2. The Court concludes Plaintiffs have made a sufficient showing that they will suffer irreparable injury:

(a) At a minimum the curtailment of their constitutionally protected speech, if the preliminary injunction is not granted. *See e.g. Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (holding that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

(b) Absent an injunction, as the Act violates the Commerce Clause of the United States Constitution.

3. Finally, the Court concludes that the preliminary injunction will not cause substantial harm to others, but rather will serve the public interest, because it will protect the free expression of the millions of Internet users both within and outside of the State of Michigan.

Having reached these findings of fact and conclusions of law, the Court concludes that the Plaintiffs have met their burden for a motion for a preliminary injunction. The threatened injury to Plaintiffs' constitutionally protected speech outweighs any claimed damage to the Defendants. Consequently, the Court grants the Plaintiffs' Motion for a Preliminary Injunction.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT, pursuant to Fed. R.Civ.P. 65(d), the Defendants—as well as their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendants— are hereby preliminarily enjoined from enforcing or threatening to enforce 1999 Public Act 33, which amends Sections 3, 5, 6 and 7 (Mich. Comp. Laws §§ 722.673, 722.675, 722.676, and 722.677) of 1978 Public Act 33, M.C.L. §§ 722.671–722.684