**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 2 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

AMERICAN CIVIL LIBERTIES UNION; MARK
AMERIKA of Alt-X; ART ON THE NET;
FEMINIST.COM; FULL CIRCLE BOOKS;
OBGYN.NET; SANTA FE ONLINE; SEXUAL
HEALTH INSTITUTE; STOP PRISONER RAPE;
JEFF WALSH of Oasis Magazine; AMERICAN
BOOKSELLERS FOUNDATION FOR FREE
EXPRESSION; ASSOCIATION OF AMERICAN
PUBLISHERS, INC.; ELECTRONIC FRONTIER
FOUNDATION; THE FREEDOM TO READ
FOUNDATION; INTERNATIONAL PERIODICAL
DISTRIBUTORS ASSOCIATION, INC.; NEW
MEXICO LIBRARY ASSOCIATION; PEN
AMERICAN CENTER; PERIODICAL AND BOOK
ASSOCIATION OF AMERICA; PUBLISHERS
MARKETING ASSOCIATION; RECORDING
INDUSTRY ASSOCIATION OF AMERICA, INC.,

No. 98-2199

          Plaintiffs - Appellees,

    v.

GARY JOHNSON, in his official capacity as
Governor of the State of New Mexico; PATRICIA A.
MADRID, in her official capacity as Attorney
General of the State of New Mexico,

          Defendants - Appellants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CIV-98-474-LH)**

---

John H. Clough, Assistant Attorney General (Tom Udall, Attorney General, Patricia A. Madrid, Attorney General, and Steven L. Bunch, Assistant Attorney General, with him on the briefs), Santa Fe, New Mexico, for Defendants - Appellants.

Ann Beeson, American Civil Liberties Union Foundation, New York, New York (Christopher A. Hansen, American Civil Liberties Union Foundation, New York, New York, Philip B. Davis, American Civil Liberties Union of New Mexico, Albuquerque, New Mexico, and Michael A. Bamberger, Sonnenschein, Nath & Rosenthal, New York, New York, with her on the brief), for Plaintiffs - Appellees.

———————————

Before **ANDERSON**  and **BRISCOE** , Circuit Judges, and   **KIMBALL** ,[*] District Judge.

———————————

**ANDERSON** , Circuit Judge.

———————————

Defendants appeal from the grant of a preliminary injunction enjoining the enforcement of a New Mexico statute, N.M. Stat. Ann. § 30-37-3.2(A), which criminalizes the dissemination by computer of material that is harmful to minors. The district court concluded that plaintiffs, the American Civil Liberties Union ("ACLU") and various organizations and entities which communicate on the Internet, had demonstrated that they were likely to succeed on the merits of their claim that section 30-37-3.2(A) violated the First Amendment and the Commerce

———

[*]The Honorable Dale A. Kimball, United States District Judge for the District of Utah, sitting by designation.

Clause of the United States Constitution, and had met the other requirements for issuance of a preliminary injunction. We agree, and we therefore AFFIRM the district court's grant of injunctive relief.

## BACKGROUND

In its 1998 session, the New Mexico Legislature enacted section 30-37-3.2(A), which provides as follows:

> 30-37-3.2 Dissemination of material that is harmful to a minor by computer
>
> A. Dissemination of material that is harmful to a minor by computer consists of the use of a computer communications system that allows the input, output, examination or transfer of computer data or computer programs from one computer to another, to knowingly and intentionally initiate or engage in communication with a person under eighteen years of age when such communication in whole or in part depicts actual or simulated nudity, sexual intercourse or any other sexual conduct. Whoever commits dissemination of material that is harmful to a minor by computer is guilty of a misdemeanor.

The statute provides the following defenses:

In a prosecution for dissemination of material that is harmful to a minor by computer, it is a defense that the defendant has:

(1) in good faith taken reasonable, effective and appropriate actions under the circumstances to restrict or prevent access by minors to indecent materials on computer, including any method that is feasible with available technology;

(2)    restricted access to indecent materials by requiring the use of a verified credit card, debit account, adult access code or adult personal identification number; or

(3)    in good faith established a mechanism such as labeling, segregation or other means that enables indecent material to be automatically blocked or screened by software or other capability reasonably available to persons who wish to effect such blocking or screening and the defendant has not otherwise solicited a minor not subject to such screening or blocking capabilities to access the indecent material or to circumvent screening or blocking.

N.M. Stat. Ann. § 30-37-3.2(C).  The statute became effective July 1, 1998. [1]

As the district court found, "[p]laintiffs are various organizations and individuals who maintain or use computer systems to provide access to a range of information through a variety of media[,] [which] is accessible by residents of the State of New Mexico on the Internet." ACLU v. Johnson, 4 F. Supp. 2d 1024, 1026 (D.N.M. 1998).  Plaintiffs' speech includes discussions of women's health and interests, literary works and fine art, gay and lesbian issues, prison rapes, and censorship and civil liberties issues.  As the parties stipulated:

The Internet is a decentralized, global medium of communication that links people, institutions, corporations and governments around the world.  It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers.  While estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 159 countries and over 109 million users.

---

[1]The New Mexico Legislature also passed a statute criminalizing child luring by means of the computer.  See N.M. Stat. Ann. § 30-37-3.2(B).  Plaintiffs do not challenge that statute.

J. Stipulation on Facts at ¶ 2, Defendants' App. at 232. We do not recite here the specifics of how the Internet functions; where necessary, we describe any relevant features of the Internet in our analysis of this case. We note that the general contours of the Internet have been described in various other judicial opinions. See Reno v. ACLU , 521 U.S. 844, 849-57 (1997); Cyberspace, Communications, Inc. v. Engler , 55 F. Supp. 2d 737, 740-44 (E.D. Mich. 1999); American Libraries Assoc. v. Pataki , 969 F. Supp. 160, 164-67 (S.D.N.Y. 1997); Shea v. Reno , 930 F. Supp. 916, 925-34 (S.D.N.Y. 1996).

Plaintiffs filed this action on April 22, 1998, over two months prior to the statute's effective date, seeking to have enforcement of section 30-37-3.2(A) enjoined as facially invalid under the First Amendment, the Fourteenth Amendment and the Commerce Clause. Defendants filed motions to dismiss, arguing (1) plaintiffs lacked standing and/or the issue was not ripe for decision; (2) the Eleventh Amendment bars this suit; and (3) the court should abstain until the New Mexico Supreme Court has had an opportunity to interpret the language of section 30-37-3.2(A) so as to resolve the constitutional issues presented.

The district court held that plaintiffs had standing to bring this action and that the matter was ripe for review; that abstention would not be appropriate; and that the Eleventh Amendment did not bar this suit seeking prospective injunctive relief. See Johnson , 4 F. Supp. 2d at 1026. The court then held a hearing on

plaintiffs' motion for a preliminary injunction, where it heard testimony from five witnesses, reviewed affidavits, declarations and the Joint Stipulation on Facts, and listened to argument from counsel. The court subsequently granted plaintiffs' motion for a preliminary injunction.    See Johnson , 4 F. Supp. 2d at 1029. [2]

Defendants appeal, arguing the district court: (1) erred in refusing to dismiss this case for lack of standing because section 30-37-3.2(A) has not yet been enforced, nor is there any real and imminent threat of such enforcement; (2) erroneously interpreted section 30-37-3.2(A) in the course of determining that plaintiffs were likely to succeed on the merits of their challenge to the statute;

_____

[2]Defendants argue that, after granting injunctive relief following the hearing, the court asked the ACLU's attorney to prepare proposed findings of fact and conclusions of law, which that attorney did. Defendants assert that:

> [a]part from one dispositional paragraph inserted by the District Court, several non-substantive modifications, and the insertion of citations supporting the Conclusions of Law, the District Court incorporated all of Plaintiffs' Proposed Findings of Fact and Conclusions of Law into its own Findings of Fact and Conclusions of Law and signed it just four days after receipt [from plaintiffs].

Defendants' Br. at 5-6. Defendants argue that this circumstance mandates that we view the district court's findings and conclusions with less deference than they would otherwise deserve. We of course review any legal conclusions de novo. Further, "[t]he Supreme Court has held that although a trial judge may be criticized for his wholesale adoption of the prevailing party's findings of fact, nevertheless 'even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.'" Dowell v. Board of Educ., 8 F.3d 1501, 1509 (10th Cir. 1993) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 572 (1985)).

-6-

(3) erroneously found plaintiffs would suffer irreparable injury unless the injunction issues; (4) erred in including New Mexico's district attorneys in the preliminary injunction's coverage; and (5) reached various other erroneous legal conclusions. At oral argument of this case, defendants also urged us to certify the interpretation of section 30-37-3.2(A) to the New Mexico Supreme Court before resolving any constitutional issues.

**DISCUSSION**

**I. Standing**

"Standing is a threshold, jurisdictional issue." Keyes v. School Dist. No. 1, 119 F.3d 1437, 1445 (10th Cir. 1997). To establish standing, plaintiffs "must have suffered an 'injury-in-fact.'" Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1572 (10th Cir. 1995) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). To establish an injury-in-fact, plaintiffs must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (citations and quotations omitted). Defendants argue plaintiffs lack standing because this suit was brought before the effective date of section 30-37-3.2(A), and because plaintiffs have not "received a real and concrete threat of prosecution from law enforcement authorities," Defendants' Br. at 43, nor have they demonstrated that

-7-

they refrained from constitutionally protected conduct or actually violated the law. We disagree.

In Virginia v. American Booksellers Assoc., 484 U.S. 383 (1988), the Supreme Court held that plaintiffs had standing to challenge a statute prohibiting the commercial display of sexual materials harmful to juveniles, even though "plaintiffs' challenge was . . . made before the statute became effective." Id. at 392. The Court held that the injury-in-fact requirement of standing was met "as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." Id. The Court further stated:

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

Id. at 393. We likewise agree with this recent observation by a district court facing a similar challenge to a similar statute:

> Under the criteria outlined by the Supreme Court in Lujan, the plaintiffs have standing, because an alleged injury is "certainly impending," if the statute takes effect and the material they disseminate is deemed "sexually explicit." No one should have to go through being arrested for a felony, publically shamed, and pay for a defense only to have a court find that the newly enacted statute is unconstitutional. This can, and should, be determined before such injury occurs.

Cyberspace, Communications, Inc. v. Engler, 55 F. Supp. 2d 737, 745-46 (E.D. Mich. 1999) (quoting Lujan, 505 U.S. at 564 n.2). [3]

We also conclude, for substantially the same reasons, that the matter is ripe for review. "[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." National Treasury Employees Union v. United States, 101 F.3d 1423, 1428 (D.C. Cir. 1996). Moreover, as we have observed, "customary ripeness analysis . . . is . . . relaxed somewhat . . . where a facial challenge, implicating First Amendment values, is brought." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995). In that situation, "'[r]easonable predictability of enforcement or threats of enforcement, without

_____

[3]Defendants attempt to undermine the nature of the "injury" to plaintiffs by arguing that plaintiffs have not demonstrated that their Internet communications meet the definition of "material that is harmful to a minor" under section 30-37-3.2(A). The New Mexico statute defines "harmful to minors" as material which (1) "predominately appeals to the prurient, shameful or morbid interest of minors,' and (2) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors,' and (3) is utterly without redeeming social importance for minors." N.M. Stat. Ann. § 30-37-1(F). Defendants argue that, since plaintiffs assert their Internet communications have social importance and are protected for adults, they fail to meet the definition of "harmful to a minor." Defendants overlook the basic point that what may be "patently offensive . . . *for minors*" or "utterly without redeeming social importance *for minors*" may very well have social importance and not be patently offensive for adults.

-9-

more, have sometimes been enough to ripen a claim.'" Id. (quoting Martin Tractor Co. v. Federal Election Comm'n, 627 F.2d 375, 380 (D.C. Cir. 1980)).

We agree with the district court that plaintiffs have established standing and ripeness.

## II. Injunctive Relief

A party seeking a preliminary injunction must show that four conditions are met:

> (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest.

Kiowa Indian Tribe of Oklahoma v. Hoover, 150 F.3d 1163, 1171 (10th Cir. 1998). We review the grant of a preliminary injunction for an abuse of discretion. Kansas Health Care Assoc., Inc. v. Kansas Dep't of Social & Rehabilitation Servs., 31 F.3d 1536, 1543 (10th Cir. 1994). We reverse that grant "only if the district court 'abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings.'" Id. (quoting Autoskill Inc. v. National Educ. Support Sys., Inc., 994 F.2d 1476, 1487 (10th Cir. 1993)).

The district court found that plaintiffs had satisfied all four conditions for the issuance of a preliminary injunction. We agree.

-10-

**A. Likelihood of Success on Merits**

**1. First Amendment**

The district court held that section 30-37-3.2(A) violates the First and Fourteenth Amendments "because it effectively bans speech that is constitutionally protected for adults;" it does not "directly and materially advance a compelling governmental interest;" it is not "the least restrictive means of serving its stated interest;" it "interferes with the rights of minors to access and view material that to them is protected by the First Amendment;" it is "substantially over-broad;" and it "prevents people from communicating and accessing information anonymously." Johnson, 4 F. Supp. 2d at 1033. Defendants respond that section 30-37-3.2(A) can and must be read narrowly, and, so narrowed, it is constitutional under the authority of Ginsberg v. New York, 390 U.S. 629 (1968) (upholding conviction for selling obscene magazine to minor).

"Sexual expression which is indecent but is not obscene is protected by the First Amendment." Sable Communications, Inc. v. FCC, 492 U.S. 115, 126 (1989). As the Court has acknowledged, however, the government may "regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." Id. While there is an indisputably "compelling interest in protecting the physical

-11-

and psychological well-being of minors," nonetheless, the government's chosen means to achieve that end must be "carefully tailored." <u>Id.</u> The Court made clear in <u>Reno v. ACLU</u> , 521 U.S. at 870, that content-based regulation of Internet speech is subject to that same strict scrutiny. [4]

Plaintiffs rely heavily upon <u>Reno</u>, in which the Supreme Court held that portions of the Communications Decency Act ("CDA"), 47 U.S.C. § 223(a)(1), (d), violated the First Amendment. Because the Court's analysis in <u>Reno</u> is central to our resolution of this case, we examine that decision in some detail.

### a. <u>Reno v. ACLU</u>

The Court in <u>Reno</u> held that two provisions of the CDA were facially overbroad. The first imposed liability on anyone who:

> (B) by means of a telecommunications device knowingly–
> (i) makes, creates, or solicits, and
> (ii) initiates the transmission of,
> any . . . communication which is obscene or indecent, knowing that
> the recipient of the communication is under 18 years of age . . . .

---

[4]The Court has determined which level of scrutiny to apply to particular types of speech, depending in part on the particular speech medium involved. Thus, for example, attempts to regulate the print media have been subjected to strict scrutiny, while the broadcast media have been afforded less First Amendment protection. After examining the nature of the Internet, and concluding that it is more similar to the telephone as a communication medium than to the broadcast media, the Court in <u>Reno</u> determined that the Internet deserved the highest level of First Amendment protection.

-12-

47 U.S.C. § 223(a). The second imposed liability on anyone who knowingly:

> (A) uses an interactive computer service to send to a specific person or persons under 18 years of age, or
> (B) uses any interactive computer service to display in a manner available to a person under 18 years of age, any . . . communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs . . . .

47 U.S.C. § 223(d). The CDA contained two defenses virtually identical to two of the defenses provided in section 30-37-3.2(A). One defense addressed those who take "good faith, reasonable, effective, and appropriate actions" to restrict access by minors to the prohibited communications. § 223(e)(5)(A). The other defense addressed those who restrict access to the prohibited communications "by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number." § 223(e)(5)(B).

Plaintiffs in Reno challenged the CDA as facially overbroad in violation of the First Amendment and vague in violation of the Fifth Amendment. The Court held the statute was overbroad and vague in violation of the First Amendment without separately reaching Fifth Amendment vagueness. The Court reached that conclusion by considering both the particular language and structure of the CDA, as well as the nature and function of the Internet. It held that "the vague contours of the coverage of the statute" cause it to "unquestionably silence[] some speakers whose messages would be entitled to constitutional protection." Reno, 521 U.S.

-13-

at 874.[5] This is particularly troublesome because the CDA is a "content-based regulation of speech" which imposes criminal liability. Id. at 871-72.

Significantly, in rejecting the government's argument that the CDA does not prohibit protected adult communication, the Court rejected the government's "incorrect factual premise that prohibiting a transmission whenever it is known that one of its recipients is a minor would not interfere with adult-to-adult communication." Id. at 876. That factual premise is incorrect when the communication medium is the Internet because "[g]iven the size of the potential audience for most messages, . . . the sender must be charged with knowing that one or more minors will likely view it." Id. Moreover, it would be prohibitively expensive to require Internet users, many of whom are non-commercial entities, to verify the age of those to whom communications are sent.

Given its vagueness and breadth, the Court concluded that the CDA was not narrowly tailored to achieve the goal of protecting minors, in view of the fact that:

_____

[5]The Court noted, as examples, the following ambiguities in the CDA's coverage: the term "indecent" is nowhere defined; the phrase "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs" is ambiguous and, as applied to the Internet, "means that any communication available to a nation-wide audience will be judged by the standards of the community most likely to be offended by the message." Reno, 521 U.S. at 877-78.

-14-

possible alternatives [exist] such as requiring that indecent material be 'tagged' in a way that facilitates parental control of material coming into their homes, making exceptions for messages with artistic or educational value, providing some tolerance for parental choice, and regulating some portions of the Internet—such as commercial web sites—differently than others, such as chat rooms.

Id. at 879.

The Court also rejected the government's narrowing interpretation of the CDA, which attempted to limit the CDA's scope by focusing on the "plain meaning" of the Act's "knowledge" and "specific person" requirements.        Id.  The government argued that, properly and narrowly construed, the CDA prohibited "the dissemination of indecent messages only to persons known to be under 18." Id. at 880.  The Court rejected this interpretation, stating that it "ignores the fact that most Internet fora—including chat rooms, newsgroups, mail exploders, and the Web—are open to all comers.  The Government's assertion that the knowledge requirement somehow protects the communications of adults is therefore untenable.  Even the strongest reading of the 'specific person' requirement of § 223(d) cannot save the statute."        Id.[6]

_____

[6]The Court also observed that, even if the CDA only prohibited communications where the sender knew a recipient was under 18, it would still chill otherwise permissible speech among adults.  This is so because it would permit a "'heckler's veto' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old child—a 'specific person . . . under 18 years of age,' would be present."  Reno 521 U.S. at 880 (quoting 47 U.S.C. § 223(d)(1)(A)).

-15-

Finally, the Court rejected the contention that the CDA's defenses salvage the Act. The Court first held that the defense requiring "good faith, reasonable, effective, and appropriate actions," 47 U.S.C. § 223(e)(5), to prevent access by minors is "illusory" because current technology does not permit *effective* prevention of access. With respect to the defense of requiring use of a verified credit card or adult identification number, the Court observed that commercial providers of sexually explicit material already employ such techniques, but there is no proof that they actually work, and it is not economically feasible for non-commercial speakers to employ such techniques. Thus, the Government has "failed to prove that the proffered defense[s] would significantly reduce the heavy burden on adult speech produced by the prohibition on offensive displays." Id. at 882. The Court accordingly concluded that the CDA "threatens to torch a large segment of the Internet community." Id.

### b. N.M. Stat. Ann. § 30-37-3.2(A)

Defendants in this case attempt to distinguish both the language of the CDA itself, and the Court's reasoning in finding it unconstitutional, in an effort to convince us that we should not reach the same result with respect to section 30-37-3.2(A). We conclude, however, that the essence of the Supreme

Court's rationale, and the similarities between the two statutes, do compel the same result.

As did the government in Reno, defendants here urge us to narrowly read section 30-37-3.2(A) to apply only to the following situations: (1) communications using a computer communications system in which (2) the sender deliberately ("knowingly and intentionally") (3) sends a message which is "harmful to minors" as defined in section 30-37-3.2(A), which is, in turn, the same as that approved in Ginsberg,[7] (4) to a specific individual recipient who the

_____

[7]In Ginsberg, the Supreme Court upheld a statute which prohibited the sale to minors of materials that were "harmful to minors" even though they were not obscene or otherwise prohibited for adults. "Harmful to minors" had a specific three-part definition. Ginsberg, 390 U.S. at 646. Section 30-37-3.2(A) contains the same definition of "harmful to minors."

Defendants argue that "[t]his case is an electronic Ginsberg case, or cyber-Ginsberg: nothing more, nothing less." Defendants' Br. at 7. We disagree. As the Supreme Court noted in Reno, there are significant differences between Ginsberg, involving face-to-face sales of magazines, and a case such as this one and Reno, involving communications on the Internet: (1) the prohibition against sales to minors in Ginsberg did not prevent parents from purchasing the prohibited magazines for their children, whereas under the CDA, or section 30-37-3.2(A), "neither the parents' consent—nor even their participation—in the communication would avoid the application of the statute," Reno, 521 U.S. at 865; (2) the statute in Ginsberg applied only to commercial transactions, whereas the CDA and section 30-37-3.2(A) apply to commercial and non-commercial transactions, the latter of which comprise a measurable proportion of Internet communications; and (3) the statute in Ginsberg defined minors as those under 17, whereas the CDA and section 30-37-3.2(A) include an additional year because they define minors as those under 18. See Reno, 521 U.S. at 865-66. Additionally, as the district court noted recently in Cyberspace, Communications:
(continued...)

-17-

sender knows to be a minor ("solely and exclusively an individual minor recipient"). They thus argue that section 30-37-3.2(A) "does not apply to group communications which include both adults and minors in the group, or where a fact situation presents a mere probability that minors may be part of the receiving group." Aplts.' Br. at 19.

We may narrowly construe a statute in certain circumstances:

> It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld. The key to application of this principle is that the statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements.

---

[7](...continued)

[I]n [Ginsberg], the "materials" referenced were magazines . . . . Magazines . . . can be brown bagged or hidden in the backroom of purveyors. With the Internet, you would have to "close the bookstore" because the disseminator and the recipient are not face to face. A magazine can be regulated or censored by the county in which it is located. A person's age can be verified because the person is physically there, and the disseminator can logically be held responsible for conveying "sexually explicit matter" to a minor. The Internet does not distinguish between minors and adults in their audience. To comply with the Act, a communicant must speak only in language suitable for children.

Cyberspace, Communications, Inc., 55 F. Supp. 2d at 747; see also Reno, 521 U.S. at 889 (O'Connor, J., concurring in the judgment in part and dissenting in part) (noting that the "twin characteristics of geography and identity" differentiate the world of Ginsberg from that of the Internet).

Virginia v. American Booksellers' Ass'n, 484 U.S. at 397. As indicated, the statute must be *readily susceptible* to the narrowing construction. See Reno, 521 U.S. at 884. We agree with plaintiffs that defendants' proposed narrowing construction really amounts to a wholesale rewriting of the statute. That we cannot do.

Defendants argue section 30-37-3.2(A) only applies where the recipient is "solely and exclusively an individual minor recipient." Aplts.' Br. at 21. As plaintiffs point out, the statute nowhere uses those limiting words, nor is it readily susceptible to such a limiting construction. The statute criminalizes "knowingly and intentionally initiat[ing] or engag[ing] in communication with a [minor]." § 30-37-3.2(A). It does not limit such communication to one-on-one situations where the only recipient is a single minor. Indeed, as plaintiffs note, defendants' interpretation would lead to the absurd result that no violation of the statute would occur if someone sent a message to two minors, or a chat room full of minors, or a minor and an adult.

Defendants also argue that the intent clause ("knowingly and intentionally initiate or engage in communication with a person under eighteen") appropriately narrows the statute. But the statutory definition of "knowingly" only requires "having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of . . . the age of the minor." N.M.

-19-

Stat. Ann. § 30-37-1(G). As the Supreme Court acknowledged in Reno, "[g]iven the size of the potential audience for most messages [on the Internet], in the absence of a viable age verification process, the sender must be charged with knowing that one or more minors will likely view it." Reno, 521 U.S. at 876. Thus, virtually *all* communication on the Internet would meet the statutory definition of "knowingly" and potentially be subject to liability under section 30-37-3.2(A). Indeed, the Supreme Court unequivocally rejected this very argument in Reno: "[t]he Government's assertion that the knowledge requirement somehow protects the communications of adults is . . . untenable. Even the strongest reading of the 'specific person' requirement of § 223(d) cannot save the statute." Id. at 880 (emphasis added). [8]

---

[8]Defendants attempt to distinguish Reno on this point, by arguing that the CDA was broader than section 30-37-3.2(A). They cite the CDA's prohibition on the use of a computer to "display in a manner available to a person under 18 years of age" certain material. 47 U.S.C. § 223(d)(1)(B). As plaintiffs note, this argument ignores the fact that the Supreme Court held other parts of the CDA unconstitutionally overbroad and vague, including the knowing initiation of the transmission of certain material to someone "knowing the recipient is under 18 years of age" and the knowing sending of material to "a specific person or persons under 18 years of age." 47 U.S.C. § 223(a)(1)(B), (d)(1)(A). Those provisions are virtually identical to the narrowed construction of section 30-37-3.2(A) that defendants urge us to adopt. The Supreme Court's rejection of the argument that the "knowledge" and the "specific person" requirements salvaged the overbreadth of the CDA compels the rejection of defendants' similar argument in this case.

-20-

Finally, as defendants virtually concede in their reply brief, the defenses contained in the New Mexico statute are inconsistent with defendants' interpretation of the statute. If section 30-37-3.2(A) only applies to a person who intentionally communicates with a particular individual whom he or she knows to be a minor, it would be nonsensical to permit such a person to avoid liability by arguing the good faith defense, or asking for a credit card number or other age verification or labeling his or her speech. The fact that the defenses are directed at group communications that have unique dynamics on the Internet certainly suggests that the basic prohibition of the statute also includes, and was intended to include, group communications. This further undermines the viability of defendants' interpretation of section 30-37-3.2(A).

In sum, the statute as written, like the CDA, unconstitutionally burdens otherwise protected adult communication on the Internet. Further, it is not "readily susceptible" to the extremely narrow interpretation defendants advance.

### c. Statutory defenses

Defendants next suggest that the defenses in the New Mexico statute provide "the sort of 'narrowing tailoring' that will save an otherwise patently invalid unconstitutional provision." Reno, 521 U.S. at 882. We disagree. The Supreme Court in Reno held that a "good faith" defense virtually identical to the

defense provided in § 30-37-3.2(C)(1) was "illusory." Id. at 881. It also held that a defense requiring verification by means of a credit card or adult access or identification code was equally ineffective because the government "failed to prove that the proffered defense would significantly reduce the heavy burden on adult speech produced by the prohibition on offensive displays." Reno, 521 U.S. at 882. Finally, defendants in this case have not demonstrated, nor do they seriously argue, that the third defense, exempting those who "in good faith establish a mechanism such as labeling, segregation or other means that enables indecent material to be automatically blocked or screened" will be any more effective at actually preventing minors from accessing material on the Internet.

We therefore agree with the district court that, as in Reno, the defenses to section 30-37-3.2(A) do not salvage an otherwise unconstitutionally broad statute. In so holding, we note that a district court has recently reached the same conclusion regarding a similar statute. See Cyberspace, Communications, Inc., 55 F. Supp. 2d at 751 (holding unconstitutional under the First Amendment a statute prohibiting the "knowing[] disseminat[ion] to a minor [of] sexually explicit visual or verbal material that is harmful to minors"); see also Shea v. Reno, 930 F. Supp. 916 (S.D.N.Y. 1996) (prior to the Supreme Court's analysis in Reno, holding the CDA unconstitutional under the First Amendment).

### 2. Commerce Clause

The district court also held that plaintiffs in this case demonstrated a likelihood of success on their argument that section 30-37-3.2(A) violated the Commerce Clause. Although we need not reach this issue, since we have already held plaintiffs have demonstrated a likelihood of success on their First Amendment argument, we do so, albeit briefly.

The "dormant implication of the Commerce Clause prohibits state . . . regulation . . . that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" General Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997) (quoting Reeves, Inc. v. Stake, 447 U.S. 429, 437 (1980)) (citations omitted). Moreover, the Supreme Court has long recognized that certain types of commerce are uniquely suited to national, as opposed to state, regulation. See, e.g., Wabash, St. L. & P.R. Co. v. Illinois, 118 U.S. 557 (1886) (holding states cannot regulate railroad rates).

The district court held that section 30-37-3.2(A) violated the Commerce Clause in three ways: (1) it regulates conduct occurring wholly outside of the state of New Mexico; (2) it constitutes an unreasonable and undue burden on interstate and foreign commerce; and (3) it subjects interstate use of the Internet to inconsistent state regulation. The court below largely relied upon the detailed Commerce Clause analysis in American Libraries Ass'n v. Pataki, 969 F. Supp.

-23-

160, 168-83 (S.D.N.Y. 1997). We agree with that analysis. As the Pataki court observed:

> The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed. Typically, states' jurisdictional limits are related to geography; geography, however, is a virtually meaningless construct on the Internet.

Id. at 168-69.

### a. Regulation of conduct outside New Mexico

Defendants argue that section 30-37-3.2(A), properly construed, only addresses intrastate conduct. As the Pataki court stated in rejecting that same argument, that analysis "is unsupportable in light of the text of the statute itself . . . and the reality of Internet communications." Pataki, 969 F. Supp. at 169. Section 30-37-3.2(A) contains no express limitation confining it to communications which occur wholly within its borders. Rather, it "applies to any communication, intrastate or interstate, that fits within the prohibition and over which [New Mexico] has the capacity to exercise criminal jurisdiction." Pataki, 969 F. Supp. at 169-70.

Moreover, the nature of the Internet forecloses the argument that a statute such as section 30-37-3.2(A) applies only to intrastate communications. Even if it

is limited to one-on-one e-mail communications, as defendants assert section 30-37-3.2(A) properly is limited, there is no guarantee that a message from one New Mexican to another New Mexican will not travel through other states en route. See Pataki, 969 F. Supp. at 171;  see also  Cyberspace, Communications, Inc.  , 55 F. Supp. 2d at 751 ("virtually all Internet speech is . . . available everywhere"). Thus, section 30-37-3.2(A) "cannot effectively be limited to purely intrastate communications over the Internet because no such communications exist." Pataki, 969 F. Supp. at 171. We therefore agree with the district court    that section 30-37-3.2(A) represents an attempt to regulate interstate conduct occurring outside New Mexico's borders, and is accordingly a per se violation of the Commerce Clause. [9]

### b. Burden on interstate commerce compared to local benefit

We further agree, for the reasons outlined in     Pataki , that section 30-37-3.2(A) is an invalid indirect regulation of interstate commerce because, under the balancing test of    Pike v. Bruce Church, Inc.   , 397 U.S. 137, 142 (1970), the burdens on interstate commerce imposed by section 30-37-3.2(A) exceed any

---

[9]Although defendants initially attempted to argue that the "non-commercial, recreational use" of the Internet is not "commerce" subject to the Commerce Clause, they wisely appeared to withdraw from that argument and agree that Internet communication can affect interstate commerce and, therefore, be subject to the Commerce Clause.

local benefits conferred by the statute. See V-1 Oil Co. v. Utah State Dep't of Pub. Safety , 131 F.3d 1415, 1423-24 (10th Cir. 1997). Defendants' primary response to this argument is to reiterate the importance of the state's interest in protecting minors from sexually oriented materials which are "harmful to minors." We agree that the protection of minors from such materials is an undeniably compelling governmental interest, but the question in the context of the validity of section 30-37-3.2(A) is whether the means chosen to further that interest (§ 30-37-3.2(A)) excessively burden interstate commerce compared to the local benefits the statute actually confers. The local benefits of section 30-37-3.2(A), particularly as narrowly construed by defendants, are not huge. As the Pataki court noted with respect to the New York statute challenged in that case, section 30-37-3.2(A) "can have no effect on communications originating outside the United States." Pataki , 969 F. Supp. at 178.

Further, New Mexico's "prosecution of parties from out of state who have allegedly violated [section 30-37-3.2(A)], but whose only contact with [New Mexico] occurs via the Internet, is beset with practical difficulties, even if [New Mexico] is able to exercise criminal jurisdiction over such parties." Id. Finally, defendants' own interpretation of the statute—that it applies only to one-on-one communications between a sender in New Mexico and a recipient in New Mexico whom the sender knows to be a minor—renders it so narrow in scope that the

-26-

actual benefit conferred is extremely small. As another district court has observed with respect to the CDA, which defendants argue is broader in scope than section 30-37-3.2(A):

> [The statute] will almost certainly fail to accomplish the Government's interest in shielding children from pornography on the Internet. Nearly half of Internet communications originate outside the United States, and some percentage of that figure represents pornography. Pornography from, say, Amsterdam will be no less appealing to a child on the Internet than pornography from [Albuquerque], and residents of Amsterdam have little incentive to comply with [the statute].

ACLU v. Reno, 929 F. Supp. 824, 882 (E.D. Pa. 1996), aff'd, 521 U.S. 844 (1997). Balanced against those limited local benefits "is an extreme burden on interstate commerce." Pataki, 969 F. Supp. at 179. Thus, section 30-37-3.2(A) constitutes an invalid indirect regulation of interstate commerce.

### c. Inconsistent regulation

The third ground upon which the district court held section 30-37-3.2(A) violates the Commerce Clause is that it subjects the use of the Internet to inconsistent regulations. As we observed, supra, certain types of commerce have been recognized as requiring national regulation. See, e.g., Wabash, St. L. & P. Ry. Co., 118 U.S. at 574-75 (noting that "[c]ommerce with foreign countries and among the states" requires "only one system of rules, applicable alike to the whole country"). The Internet is surely such a medium. We agree with the court

-27-

in Pataki , when it observed, "[t]he Internet, like . . . rail and highway traffic . . ., requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations." Pataki , 969 F. Supp. at 182; see also Kenneth D. Bassinger, Dormant Commerce Clause Limits on State Regulation of the Internet: The Transportation Analogy , 32 Ga. L. Rev. 889, 904 (Spring 1998) ("The structure of the Internet bears a striking resemblance to a railroad, highway, or other means of interstate transportation."). [10]

Plaintiffs have accordingly met their burden of demonstrating a likelihood that they will prevail on their claims that section 30-37-3.2(A) violates both the First Amendment and the Commerce Clause. We turn now to the remaining requirements for the issuance of a preliminary injunction.

---

[10]In their opening appellate brief, defendants asserted that "[c]ertification may be appropriate on remand, [but they] do not request it at this juncture of the litigation." Defendants' Br. at 64. In their reply brief, however, they argued that our resolution of the scope of section 30-37-3.2(A) would "improperly oust[] the role of state courts in the interpretation of New Mexico's statutes." Defendants' Reply Br. at 18. At oral argument, they asked us to certify to the New Mexico Supreme Court the proper interpretation of section 30-37-3.2(A). Or, as they argued below, they would have us abstain from considering the constitutionality of the statute, pending an interpretation of the statute by the New Mexico courts.

The Supreme Court has observed that it is "particularly reluctant to abstain in cases involving facial challenges based on the First Amendment." City of Houston v. Hill, 482 U.S. 451, 467 (1987). Given the obvious and facial overbreadth of the state statute at issue, and the fact that it is not reasonably susceptible to an appropriate limiting construction, abstention or certification are unnecessary.

-28-

**B. Irreparable Harm**

The district court held that "[p]laintiffs have made a sufficient showing that they will suffer irreparable injury—at a minimum the curtailment of their constitutionally protected speech—if the preliminary injunction is not granted." Johnson, 4 F. Supp. 2d at 1034. We agree. See Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Pataki, 969 F. Supp. at 168 (noting that the "[d]eprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury").

**C. Injury Outweighs Harm**

We further agree with the district court's conclusion that "the threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute." Johnson, 4 F. Supp. 2d at 1034.

**D. Public Interest**

Finally, we further agree that "the preliminary injunction will not be adverse to the public interest as it will protect the free expression of the millions of Internet users both within and outside of the State of New Mexico." Id.

**III. Scope of Injunctive Relief**

Defendants argue the district court erred in including New Mexico's district attorneys within the scope of the injunction. We disagree. Fed. R. Civ. P. 65(d) provides that an injunction binds not only the parties but also "their officers, agents, servants, employees, and attorneys, and . . . those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." This action is a facial challenge to a New Mexico statute, brought against the governor and attorney general of New Mexico in their official capacities. Thus, it is an action against the State of New Mexico, see Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978) (observing that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"), seeking to enjoin enforcement of section 30-37-3.2(A) by the State. Defendants argue the district attorneys received no notice of, nor have they participated in, this action, and they argue there is no indication that district attorneys are "persons in active concert or participation with" defendants.

"The district attorney is the law officer of the district [and] is to prosecute criminal cases on behalf of the State." State v. Session, 574 P.2d 600, 601 (N.M. Ct. App. 1978); see also N.M. Stat. Ann. § 36-1-18 (describing duties of district attorney). To the extent district attorneys would attempt to enforce section 30-37-3.2(A), an injunction against the governor and attorney general prohibiting

-30-

such enforcement binds those attorneys. The district court properly included district attorneys within its grant of injunctive relief. See Pataki, 969 F. Supp. at 163 (holding that "a preliminary injunction would effectively bar enforcement of the Act whether the prosecution happened to be brought directly by the Attorney General's office or by one of the individual District Attorneys"). [11]

**CONCLUSION**

For the forgoing reasons, we AFFIRM the issuance of a preliminary injunction against enforcement of section 30-37-3.2(A).

---

[11]Defendants also argue that the district court, rather than enjoining the entire statute, should have tailored the injunction to enjoin only the unconstitutional aspects of section 30-37-3.2(A). They suggest, and we discern, no reasonable way to do so, see Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504-05 (1985), and neither we, nor the district court, may rewrite the statute to avoid the constitutional problems we have identified. See United States v. National Treasury Employees Union, 513 U.S. 454, 479 & n.26 (1995). Defendants also challenge the district court's injunction to the extent it prohibits them from "investigating or reviewing any matter based on or premised upon" section 30-37-3.2(A). Order, Appellants' App. Vol. II at 415. This argument is meritless. If section 30-37-3.2(A) is deemed unconstitutional in its entirety, there could be no investigation or review premised upon it.