**PSINET INC., et al., Plaintiffs,**

v.

**Warner D. CHAPMAN,
et al., Defendants.**

**No. CIV. A. 3:99CV00111.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

Aug. 8, 2000.

Garrett M. Smith, Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, VA, Norman Christopher Hardee, Wiley, Rein & Fielding, Washington, DC, John Joshua Wheeler, Charlottesville, VA, for Plaintiffs.

Mark L. Earley, William Henry Hurd, Office of Attorney General, Richmond, VA, John Walter Zunka, Taylor & Zunka, Ltd., Charlottesville, VA, Alvaro A. Inigo, Taylor, Zunka, Milnor & Carter, Charlottesville, VA, Mark A. Trank, Larry Wade Davis, Office of County Attorney, Charlottesville, VA, for Defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

Business plaintiffs PSINet, Inc., Charlottesville Sexual Health & Wellness Clinic, Portico Publications Ltd., Silverchair Science + Communications, Inc., Rockbridge Global Village, Sexual Health Network, A Different Light Bookstores, Lambda Rising Bookstores, and Bibliobytes, Inc. joined by membership organization plaintiffs, The Commercial Internet Exchange Association, Virginia ISP Alliance, American Booksellers Foundation for Free Expression, Periodical and Book Association of America, Inc., Freedom to Read Foundation, The Comic Book Legal Defense Fund, and People for the American Way and individual plaintiffs, Chris Filkins, Harlan Ellison, and Susie Bright filed suit against defendants Warner D. Chapman and James L. Camblos, III, Commonwealth Attorneys, and Julian Rittenhouse and John F. Miller, Chiefs of Police, on December 15, 1999, invoking federal jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 2201 and 42 U.S.C.

§ 1983, 1988.[1] Upon receipt of a stipulated order signed by counsel for the parties, the court dismissed defendants Julian Rittenhouse and John F. Miller from the case. On February 15, 2000, the court heard arguments from counsel on plaintiff's motion for a preliminary injunction. Prior to the hearing date, the court had received the parties' memoranda and supporting affidavits. At the hearing, additional exhibits also were admitted. Following the hearing, the defendants filed a motion to hold the proceedings in abeyance pending action of the Virginia legislature. Subsequent to this motion, and pursuant to the action of the legislature, the court ordered that the parties file supplemental memoranda regarding the plaintiffs' motion for preliminary injunction. Having thoroughly considered the issue, the court finds that an injunction is appropriate for this case, and thus grants the plaintiffs' motion for a preliminary injunction.

## I.

### A. The Plaintiffs

Plaintiffs represent a spectrum of businesses, membership organizations, and individuals—including Internet service providers, organizations representing booksellers, publishers, and other media interests, online businesses, individual authors and artists, and others—who use the Internet to communicate, disseminate, display, and to seek access to a broad range of speech. Plaintiffs communicate online both within and from outside the Commonwealth of Virginia, and plaintiffs' speech is accessible both within and outside of Virginia. All of the plaintiffs utilize the Internet to further their business and organizational goals. Plaintiffs all fear that their online speech could be considered "harmful to juveniles" in some communities under the statute in question, Va.Code Ann. § 18.2-391 (Michie Supp.1999) (amended 2000), even though that speech may receive full constitutional protection as to adults.

### B. The Internet

Based on the pleadings of the parties and the findings of other federal courts and the Supreme Court, this court finds the following factual information about the Internet relevant to the underpinnings of this legal opinion.[2]

The Internet is a decentralized, global medium of communications that links people, institutions, corporations, and governments around the world. Host computers—those storing information and relaying communications on the Internet—number in the tens of millions, and personal computers accessing the Internet have been estimated to number in

---

1. 28 U.S.C. § 1331 grants original jurisdiction to federal district courts of actions arising under the Constitution and laws of the U.S.

   28 U.S.C. § 1343(3) gives federal district courts original jurisdiction of any civil action commenced by a person "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

   28 U.S.C. § 2201 gives courts authority to create a remedy "upon the filing of an appropriate pleading" by declaring the rights of the parties seeking such a declaration.

   42 U.S.C. § 1983 imposes civil liability on any person who under color of State law causes any citizen to be deprived of rights under the Constitution or laws and creates a private cause of action for the citizen whose rights are thus violated.

   42 U.S.C. § 1988 gives the court the authority to award costs and attorneys' fees.

2. Cases with extensive factual findings about the Internet include: *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) [hereinafter *Reno* ], *aff'g ACLU v. Reno*, 929 F.Supp. 824 (E.D.Pa.1996) [hereinafter *Reno Dist.*]; *Cyberspace, Comunications, Inc. v. Engler*, 55 F.Supp.2d 737 (E.D.Mich.1999); *ACLU v. Johnson*, 4 F.Supp.2d 1029 (D.N.M. 1998) [hereinafter *Johnson Dist.*], *aff'd ACLU v. Johnson*, 194 F.3d 1149 (10th Cir.1999) [hereinafter *Johnson* ].

the hundreds of millions. *See Reno*, 521 U.S. at 849, 117 S.Ct. 2329; *Cyberspace*, 55 F.Supp.2d at 741. The information available on the Internet is of very diverse subject matter. At any given moment, the Internet also serves as a communication medium for literally tens of thousands of conversations, debates, and social dialogues. Content ranges from academic writings, to art and literature, to medical information, to music, to news and other information, some of which contains sexually explicit material.

The Internet is distinguishable from traditional media because the Internet simply links together enormous numbers of individual computers and computer networks; therefore, no single entity or group controls the content that is available on the Internet, or the access to that content. There is no centralized point from which individual Web sites or services can be blocked. *See Reno*, 521 U.S. at 852, 117 S.Ct. 2329. Rather, the almost infinite range of information available on the Internet is supplied by millions of users on millions of separate computers around the world. The Internet also differs from traditional media in that it provides users with an unprecedented ability to interact with other users and content. Communications on the Internet do not "invade" an individual's home or appear on one's computer screen unbidden. Rather, the receipt of information "requires a series of affirmative steps more deliberate and directed than merely turning a dial." *Reno*, 521 U.S. at 854, 117 S.Ct. 2329.

Individuals may obtain access to the Internet in several ways. Internet service providers ("ISPs"), such as plaintiff PSINet, offer their subscribers access to computers or networks linked directly to the Internet. Most ISPs charge a monthly fee, but some provide free or low-cost access. In addition, national "commercial online services" (such as America Online[3]) not only serve as ISPs, but also provide subscribers services, such as monitored chat rooms, and access to proprietary content on their own networks. Many educational institutions, libraries, businesses, and other entities maintain computer networks linked directly to the Internet.

There are a variety of ways for communicating and exchanging information with other users on the Internet. The primary methods include: (1) email, which enables an individual to send an electronic message generally akin to a note or letter to an individual address or to a group of addresses; (2) instant messaging, which allows an online user to address and transmit an electronic message to one or more people with little delay between the sending of an instant message and its receipt by the addressees; (3) online discussion groups, such as "chat rooms," thousands of which have been organized by individuals, institutions, and organizations; and (4) the World Wide Web, which is currently the most popular way to provide and retrieve information on the Internet. Anyone with access to the Internet and proper software can post content on the Web, which can then be accessed by any other user anywhere in the world. The Web comprises millions of separate interconnected "Web sites" that may in turn have hundreds of separate "pages" displaying content provided by the particular person or organization that created the site.

There are a number of ways that Internet users can browse or search for content on the Web. First, every document on the Web has a virtual "address" that allows users to find and retrieve that document by entering the address into their browser. Second, a user may conduct a "search" for a particular site or kind of site by using one of a number of search "engines," which are free software available to help users navigate the Web. The user simply types a word or words as a search request, and the search engine provides a list of sites that match the search terms. The

---

**3.** Throughout this opinion, any reference by the court to particular entities shall not be considered endorsements, but are merely mentioned for illustrative purposes.

user must then affirmatively elect to view information on a particular site. Online users may also "surf" the Web by "linking" directly from one Web page to another. Almost all Web documents contain "links," which are short sections of text or images that are electronically connected to another Web document. "These links from one computer to another, from one document to another across the Internet, are what unify the Web into a single body of knowledge, and what makes the Web unique." *Reno,* 929 F.Supp. at 836–37.

For most communications over the Internet, the speaker has little or no effective control over whether minors or adults are able to gain access to his communications. *See Reno,* 521 U.S. at 855–56. In addition, speakers who publish on the Web generally make their materials publicly available to users around the world, regardless of age, and lack any practical or reliable means for preventing minors from gaining access to the information on their sites or for verifying the true age of users of their Web sites. The Internet also is wholly insensitive to geographic distinctions, and Internet protocols were designed to ignore rather than to document geographic location. While computers on the Internet do have "addresses," they are addresses on the network rather than geographic addresses in real space. Most Internet addresses contain no geographic information at all. An Internet user who posts a Web page in one state cannot readily prevent residents of other states from viewing that page, or even discern in which state visitors to the site reside. *See American Libraries Ass'n. v. Pataki,* 969 F.Supp. 160, 171 (S.D.N.Y.1997). Participants in online chat rooms and discussion groups have no way to tell when participants from another state join the conversation. *See id.* There is no practical way for an Internet speaker to prevent a message from reaching residents of his own or any particular state.

The overwhelming majority of information on the Web is provided to users free.

However, much online speech is displayed for commercial purposes where enterprises are seeking to use the Web to advance their business and organizational goals. Companies do so in a variety of ways. Some businesses, like ISPs, charge their customers for providing an electronic "pipeline" through which the customers may view information on the Internet, or for storing data that customers wish to place on the Web. In addition, to attract and retain subscribers, ISPs may also provide other Internet services such as email or chat rooms, access to which is included in subscribers' fees. Other Web companies generate revenue through advertising. These businesses offer content to attract readers, and sell access to those Web users to advertisers interested in reaching that audience.

Many online content providers—including booksellers, music stores, and art providers—allow potential customers to browse their wares free on the Internet, similar to browsing an actual book store or art gallery. Web shoppers may view samples, summaries, or even entire works at no charge, before deciding whether to make a purchase. Even apart from the material on the Web, a great deal of communication that takes place via the Internet serves a commercial purpose. For example, many entities offer free email or chat rooms to draw users to their sites, so that the sites will be more attractive to potential customers, advertisers or paying contributors. Businesses use email to communicate more efficiently with customers, suppliers, and within their own organizations. Under these and other constantly evolving Internet business models, an enormous quantity of material on the Web that is free to the user is nonetheless displayed for a commercial purpose.

To the extent that it is appropriate in this proceeding, the court accepts the findings set out above as having been found and accepted by the various courts listed in footnote 2, page 3 of this opinion.

### C. The Statute

For a number of years, the Commonwealth of Virginia has prohibited the knowing display of materials used for a commercial purpose that are harmful to juveniles. *See American Booksellers v. Commonwealth,* 882 F.2d 125, 126 (4th Cir.1989). Codified as Code of Virginia § 18.2–391 in 1970, this law was reenacted as amended in 1999, pursuant to 1999 Va. Acts ch. 936. The law was again reenacted in 2000, pursuant to the amendments adopted in 2000 Va. Acts ch. 1009. The plaintiffs' complaint challenges 1999 Va. Acts ch. 936 ("the Act"), codified in § 18.2–391 ("the statute"), which adds phrases to expand the section's criminal prohibitions to cover "electronic file[s] or message[s]." The Virginia legislature passed the Act on April 7, 1999. The Act went into effect on July 1, 1999.

The statute, as amended, makes it unlawful to "sell, rent or loan to a juvenile" or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse:

1. Any picture, photography, drawing, sculpture, motion picture film, *electronic file or message containing an image,* or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or

2. Any book, pamphlet, magazine, printed matter however reproduced, *electronic file or message containing words,* or sound recording which contains any matter enumerated in subdivision 1 of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.

Va.Code Ann. § 18.2–391 (Michie Supp. 1999) (amended 2000) (emphasis added). A violation of § 18.2–391 is a Class I misdemeanor, punishable by "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." Va.Code Ann. § 18.2–11(a) (Michie 1950).

The 2000 Amendment to § 18.2–391 adds to the statute the following paragraph:

[I]f a person uses services of an Internet service provider or an electronic mail service provider in committing acts prohibited under this subsection, such Internet service provider or electronic mail service provider shall not be held responsible for violating this subsection.

Va.Code Ann. § 18.2–391 (effective July 1, 2000). This amendment was voted upon and passed by the Virginia legislature after the parties had been heard on the plaintiffs' motion for a preliminary injunction. The court then required supplemental briefs to be filed addressing the new amendment and its effect, if any, on the plaintiffs' complaint. The 2000 amendment creates a defense for ISPs and email service providers when a person violating the statute uses the services of an ISP or email service provider in the commission of the offense. This defense does not affect the merits of the plaintiffs' claim because the statute maintains a prohibition on the use of electronic files or messages to allow juveniles to examine or peruse material that is harmful to juveniles. Thus, an ISP or email service provider may still be liable under the statute when they are responsible for creating the harmful content. Furthermore, even if the 2000 amendment entirely exempted ISPs and email providers from the statute, the standing of other plaintiffs in this matter would not be affected. *See infra* section II.A.

The definitional provisions relevant to § 18.2–391 are contained in § 18.2–390. The Virginia Code Annotated, § 18.2–390(6), defines the term "harmful to juveniles" as:

that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it

(a) predominantly appeals to the prurient, shameful or morbid interest of juveniles,

(b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and

(c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

Va.Code Ann. § 18.2–390(6) (Michie 1950). Section 18.2–390 does not define the relevant "community" for purposes of determining what is "harmful to juveniles" in the global medium of cyberspace. The statutory term "for commercial purpose" is likewise undefined. *See* Va.Code Ann. § 18.2–11(a) (Michie 1950). However, Virginia Code § 18.2–390(7) defines "knowingly" to mean:

having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both (a) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and (b) the age of the juvenile, provided however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt to ascertain the true age of such juvenile.

Va.Code. Ann. § 18.2–390(7) (Michie 1950).

## II.

*A.   Standing*

The defendants claim that none of the plaintiffs have standing, and thus, they can not properly bring this motion or this lawsuit. The defendants allege that the two requirements for standing have not been shown: (1) the plaintiff has to allege an intention to engage in a course of conduct arguably affected with a constitutional interest, and (2) there exists a credible threat of prosecution. *See Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Under the first prong, the defendants claim that the plaintiffs have failed to establish the likely applicability of the statute to the materials that they display and the communications that they engage in. The plaintiffs could, however, be prosecuted under the statute if the material they post serves a commercial purpose and is harmful to juveniles in Virginia. *See* Va.Code Ann. § 18.2–391. It does not matter whether the plaintiffs actually have engaged in the "harmful" speech prohibited by the statute or just plan to do so. *See Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301 ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (citations and quotations omitted). The chilling of speech is, in itself, injurious. *See Reno,* 521 U.S. at 872, 117 S.Ct. 2329.

■ The defendants contend that the plaintiffs fail the first prong for standing because the plaintiffs do not engage in any conduct prohibited by the Act. For example, the defendants allege that the out-of-state plaintiffs are not covered under the Act. However, this allegation falters because under the "results theory" enunciated by the Justice Holmes in *Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911), a state may prosecute someone for acts committed outside its borders if the acts were intended to produce or did produce detrimental effects within the state, provided the state can get the accused within its power. This results theory has been widely followed, including its adoption in Virginia in 1950, and it continues to the present. *See Keselica v. Commonwealth of Virginia,* 24 Va.App. 115, 119–120, 480 S.E.2d 756, 758 (1997) (citing *Travelers Health Ass'n v. Commonwealth,* 188 Va. 877, 51 S.E.2d 263 (1949), *aff'd,* 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950)). Thus, regardless of where

the violator of the statute in question originates the harmful material, if it reaches juveniles in Virginia, then Virginia law would apply. As a result, the defendants' attempts to make in-state versus out-of-state distinctions between the plaintiffs is meaningless for the purposes of standing in this matter. Due to the borderless nature of the Internet, the requisite contacts with juveniles in Virginia is probably the easiest burden for the plaintiffs to meet. What remains is whether the plaintiffs have established that they provide materials that serve a commercial purpose and are harmful to juveniles.

The plaintiffs have, overall, demonstrated the nature of their speech with enough sufficiency to establish that they intend to engage in a course of conduct arguably protected by the constitution—electronic posting of commercial material that may be "harmful to juveniles"—and that they reasonably fear prosecution under the statute in question, and, thus, will likely be held to have standing to pursue their action. *Cf. Richmond Med. Ctr. For Women v. Gilmore,* 144 F.3d 326, 328 (1998) (Luttig, J.) (single judge) (holding that Plaintiffs lacked standing because they could not reasonably fear prosecution under a statute they admittedly did not violate) (citing *Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301).

The defendants argue that the plaintiffs don't meet the second prong of the standing test because the 1999 Act has not yet been enforced, and certainly has not been enforced against any of the plaintiffs; thus, there is no credible threat of prosecution. However, "[i]n the context of threats to the right of free expression, it is not necessary that an individual first be exposed to prosecution in order to have standing to challenge a statute which is claimed to deter the exercise of constitutional rights." *Cyberspace,* 55 F.Supp.2d at 747. Surely, the Virginia Assembly, in enacting the 1999 and 2000 amendments, expects them to be enforced.

Specifically, an example of a plaintiff who has established that it represents its members whose posted material serves a commercial purpose and probably qualifies as harmful to juveniles in Virginia, is the Periodical and Book Association of America ("PBAA"). PBAA is an association with many members, including General Media Communications ("General Media"), the owner of the Penthouse website. The defendants' claim that this is insufficient to confer standing on the PBAA as an association. On the contrary, the Supreme Court has held that the standard for an association to have standing is as follows:

> "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."

*Internat'l Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228, (1986) (citations omitted). The PBAA meets these requirements for standing of an association, including the additional fact that the interest in avoiding censorship is germane to all members of the PBAA. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

The PBAA, and other plaintiffs, have standing. Although the defendants challenge the standing of other plaintiffs, for example, the ISPs (based on the § 18.2–391 2000 Amendment), it is unnecessary to address the standing of each plaintiff individually. All of the plaintiffs have virtually identical claims against the statute, but

fall into three categories of plaintiffs: businesses, associations, and individuals. Like PBAA, Lambda Rising, a business plaintiff, and Susie Bright, an individual plaintiff, are examples of plaintiffs who have sufficiently alleged standing. Once it is determined that a plaintiff has standing, and the position of the other plaintiffs is virtually the same as the one with standing, the court may proceed to the merits of the case. *See Bowsher v. Synar, et al.,* 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (where members of one of three associational plaintiffs suing on behalf of their members had standing, the court declined to consider the standing of the other plaintiffs and proceeded to the merits of the case) (citations omitted); *Secretary of Interior v. California,* 464 U.S. 312, 319, n. 3, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Having found that at least one plaintiff from each category of plaintiffs has standing, the court will proceed to the merits of the case.

*B.   Precedent Set by American Booksellers Association v. Commonwealth*

■ The defendants contend that the 1999 amendments to the statute makes Virginia Code § 18.2–391 merely redundant. Defendants argue that the 1999 amendments do not enlarge the scope of the statute, but simply sets forth another example of the kind of materials already governed by its terms. The defendants emphasize the fact that what they deem "catch-all phrases" existed before the 1999 and 2000 Amendments, thereby concluding that the additions of the phrases "electronic file or message containing and image" and "electronic file or message containing words" were simply illustrative of the existing "catch-all" language, which stated "or similar visual representation or image" and "printed matter however reproduced." *See* Va.Code § 18.2–391 (Michie Supp. 1999) (amended 2000). The defendants claim that the existence of the catch-all phrases makes the statute broad enough to encompass the Internet without the benefit of the amended language.

There are three reasons why this is fallacious. First, common sense tells a reader of the statute that the initial catch-all phrases of the statute do not cover Internet materials. For example, the words "printed matter however reproduced" refers to *printed matter*—not electronic material. Second, when the 1985 version of the statute was adopted, Internet communication was not envisioned and so the statute could not have been meant to regulate such unforseen forms of electronic communication. Third, legislatures are presumed to act with purpose so that every phrase in a statute has importance. *See, e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (a court is "obliged to give effect, if possible, to every word"); *Platt v. Union Pacific R.R. Co.,* 99 U.S. 48, 58–59, 25 L.Ed. 424 (1878) (if a construction renders a term redundant, that is a reason for rejecting that construction); *United States v. Snider,* 502 F.2d 645, 652 (4th Cir.1974) (all parts of a statute must be construed so that each part has meaning); *McLean Bank v. Nelson,* 232 Va. 420, 427, 350 S.E.2d 651, 656 (1986) (Virginia statutory interpretation requires that all words of statute be given meaning, where possible). The fact that the statute was amended to include electronic media is critical. Furthermore, the Fourth Circuit has spoken clearly on this issue: "A court should not—and we will not—construe a statute in a manner that reduces some of its terms to mere surplusage." *Commonwealth v. Browner,* 80 F.3d 869, 877 (4th Cir.1996).

Also, the defendants claim that *American Booksellers v. Virginia,* 882 F.2d 125 (4th Cir.1989), precludes this challenge because, more than ten years ago, the Fourth Circuit upheld the constitutionality of the underlying statute in question, § 18.2–391. As the defendants contend that the new amendments are not an enlargement of the old statute, they argue that the statute, as it currently exists, remains constitutional. However, as ex-

plained above, the amended language of the statute adds something entirely different to the statute that was not considered by the Fourth Circuit in 1989—the regulation of the Internet, a "unique and wholly new medium of worldwide human communication." *Reno,* 521 U.S. at 850, 117 S.Ct. 2329.

In *American Booksellers,* after a long and involved litigation process that is not now necessary to recount, the Fourth Circuit ultimately concluded that § 18.2–391, as it existed in 1989, was constitutional, after the Virginia Supreme Court has construed the statute to impose only "a minimal burden on *booksellers,*" the group that had asserted an unconstitutional effect. *American Booksellers,* 882 F.2d at 127 (citing *Commonwealth v. American Booksellers,* 236 Va. 168, 372 S.E.2d at 623, 625(1988)). The Virginia Supreme Court, upon being asked questions by the U.S. Supreme Court, had concluded that the 1985 Act merely required booksellers to segregate a few works onto a shelf located where bookstore personnel would notice inappropriate juvenile interest while carrying out their regular duties. *See id.* Such an analysis can only apply to a traditional bookstore at a physical location—a retail outlet one can actually walk into—selling conventional physical objects. *See id.* Clearly, the Fourth Circuit's 1989 analysis in *American Booksellers* did not contemplate today's Internet "bookstore," web site, chat room, etc., where there are no personnel who can monitor a juvenile's interest in sexually explicit material on the Internet. Based on this and the fact the 1999 Act's amendments to the statute newly expand its scope, the *American Booksellers* opinion does not preclude the current challenge to § 18.2–391.

### III.

*A. Preliminary Injunction*

A preliminary injunction "is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Hughes Net-*
*work Systems v. InterDigital Communications Corp.,* 17 F.3d 691, 693 (4th Cir.1994) (quoting *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981)). The purpose of an injunctive order is to "preserve the status quo during the course of a litigation, in order to prevent irreparable injury to the moving party and in order to preserve the ability of the court to render complete relief." *Federal Leasing,* 650 F.2d at 499. A preliminary injunction should only be granted where necessary to accomplish such goals. "Indeed, granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. '[T]he danger of a mistake' in this setting 'is substantial.'" *Hughes,* 17 F.3d at 693 (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.,* 780 F.2d 589, 593 (7th Cir.1986)). For this and other problems associated with the issuance of a preliminary injunction, the Supreme Court requires that the harm to the plaintiff be irreparable in order to obtain a preliminary injunction. *See Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), *cited in Hughes,* 17 F.3d at 694. The Court explained, "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson, 415 U.S. at 90, 94 S.Ct. 937 (quoting *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir. 1958)), *cited in Hughes,* 17 F.3d at 694.

*B. Four Factors and Balancing Test*

The determination of whether to grant a preliminary injunction must be made after consideration of four factors articulated in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 196 (4th Cir.1977):(1) "the likelihood of ir-

reparable harm to the plaintiff if the preliminary injunction is not granted; (2) the likelihood of harm to the defendant if the preliminary injunction is granted; (3) the likelihood that plaintiff will succeed on the merits; and (4) the public interest." *Hughes Network Systems v. InterDigital Communications Corporation,* 17 F.3d 691, 693 (4th Cir.1994) (citing *Blackwelder,* 550 F.2d at 195–96). Not all of these factors are to be accorded equal weight. The Fourth Circuit counsels that the most important consideration under the standard is the "balance of hardships" to the plaintiff and the defendant. *See Hughes,* 17 F.3d at 693 (citing *Blackwelder,* 550 F.2d at 196). Comparing the relevant harms to the plaintiff and the defendants is the most important determination, which dictates how strong a likelihood of success showing the plaintiff must make. *See id.* If the plaintiffs fail to establish that the balance of hardships tips in its favor, an injunction should only be granted if the plaintiff establishes a "substantial likelihood of success" on the merits. *See Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 818 (4th Cir.1991). The court weighs the factors, bearing in mind Judge Wilkinson's caution that issuance of a preliminary injunction should be the exception, not the rule, and that the ultimate decision of whether to grant or deny preliminary injunctive relief lies with the district court's sound discretion. *See Hennon v. Kirklands, Inc.,* 870 F.Supp. 118, 120 (W.D.Va.1994) (citing *Hughes,* 17 F.3d at 693–94). The court does not undertake this review lightly, particularly where injunction is sought against the work of a legislative body, such as the Virginia General Assembly.

### 1. Irreparable Injury to Plaintiffs

■ The 1999 Act applies to Internet speakers anywhere whose communications make minimal contacts in Virginia, i.e., where the proscribed results take place in Virginia. If no injunction issues, the plaintiffs may well be left with the Hobson's choice of self-censorship such that all content on their websites is suitable for children, or subjecting themselves to criminal liability in the state of Virginia. The injury of having to make such a decision would be immediate and irreparable. Furthermore, where one party would suffer immediate tangible loss of its advertising or promotional material, as would be the case for some plaintiffs in the present case, courts in this district have weighed such loss as a factor in the balance of harms analysis. *See Virginia Tech. Foundation, Inc. v. Family Group Ltd.,* 666 F.Supp. 856, 860 (W.D.Va.1987). Finally, failure to procure an injunction would result in a restriction of the plaintiffs' constitutionally protected right to free speech. *See ACLU v. Reno,* 194 F.3d 1149, 1163 (10th Cir. 1999) [hereinafter *Reno II* ], *aff'g ACLU v. Reno,* 31 F.Supp.2d 473, 497–98 (E.D.Pa. 1999) (citations omitted) [hereinafter *Reno Dist. II* ]. The Supreme Court has squarely stated that "the loss of first amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

### 2. Injury to Defendants

The defendants, as officers of Virginia charged with the enforcement of state criminal laws, may assert the interests of the Commonwealth. The Commonwealth has an interest in enforcement of its statutes, particularly those aimed at protecting minors. *See Manning v. Hunt,* 119 F.3d 254, 266 (4th Cir.1997); *see also Reno,* 521 U.S. at 875, 117 S.Ct. 2329 (recognizing government interest in protecting minors from harmful materials) (citations omitted). However, unlike the parental consent abortion statute in question in *Manning,* harm to the Commonwealth from enjoining the 1999 amendments to § 18.2–391 will be less because an injunction will only prevent the enforcement of the law with respect to electronic files, messages or images. The ability to protect minors in traditional, geographic settings will remain intact.

### 3. Plaintiff's Likelihood of Success on the Merits

The requisite strength of the plaintiff's showing of likelihood of success on the merits is dependent on the outcome of the balance of hardships test. Although some courts consider a showing of likelihood of success on the merits as likely to bolster the irreparable injury prong, *see, e.g., Reno Dist.,* 929 F.Supp. at 866, the Fourth Circuit practice is that the balance of harms inquiry must precede the analysis of likelihood of success, *see Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 818 (4th Cir.1991). Because the balance of hardships tips in favor of the plaintiffs, but not necessarily "decidedly" in the plaintiff's favor, the plaintiff must establish a substantial likelihood of success on the merits in order to prevail on its claim for injunctive relief. *See Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 818 (4th Cir.1991); *see also Federal Leasing,* 650 F.2d at 499 ("a weaker showing of the likelihood of irreparable injury will necessitate a stronger showing of probability of success").

The plaintiffs claim that they will likely succeed on the merits of their claim because the 1999 Act is unconstitutional on its face and violates both the First Amendment and the Commerce Clause. Because § 18.2–391 is a content-based speech restriction, it can only be upheld if it survives strict scrutiny. *See United States v. Playboy Entertainment Group, Inc.,* —— U.S. ——, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000) (citing *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). To satisfy strict scrutiny, the law in question must be (1) narrowly tailored to (2) promote a compelling government interest. *See Playboy,* 120 S.Ct. at 1886. A law is narrowly tailored if it employs the least restrictive means to achieve its goal and if there is a nexus between the government's compelling interest and the restriction. *See City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 109 S.Ct. 706,

102 L.Ed.2d 854 (1989). If a less restrictive means of meeting the compelling interest could be at least as effective in achieving the legitimate purpose that the statute was enacted to serve, then the law in question does not satisfy strict scrutiny. *See Reno,* 521 U.S. at 874, 117 S.Ct. 2329.

The plaintiffs in the present case claim that the 1999 Act fails both prongs of the strict scrutiny analysis, alleging that the amendments neither further a compelling government interest, nor are narrowly tailored to such interest. The plaintiffs also point out that every court to address a comparable state statute has held that the statute violates either the First Amendment or the Commerce Clause, or both, and all of these courts have enjoined the enforcement of the particular state statute, just as the plaintiffs seek to do in the present case. *See ACLU v. Johnson,* 194 F.3d 1149 (10th Cir.1999) (upholding preliminary injunction in case challenging New Mexico statute that makes it a misdemeanor to disseminate through use of a computer any material that is "harmful to a minor," and finding that statute violated First Amendment and Commerce Clause); *Cyberspace Communications v. Engler,* 55 F.Supp.2d 737 (E.D.Mich.1999) (granting preliminary injunction because statute's amendments, which added criminal prohibitions against using computers or the Internet to disseminate sexually explicit materials to minors, violate First and Fourteenth Amendments and Commerce Clause), *appeal docketed,* No. 99–2064 (6th Cir. Sept. 27, 1999); *American Libraries v. Pataki,* 969 F.Supp. 160 (S.D.N.Y.1997) (declining to reach First Amendment grounds but granting preliminary injunction under the Commerce Clause for New York law amended to make it a crime for an individual intentionally to use a computer to engage in communication with a minor that depicts sexual conduct and is "harmful to minors"). Furthermore, the Supreme Court held that a federal statute similar to the one here—the Communications Decency

Act ("CDA")—could not withstand strict scrutiny under the First Amendment because it lacked the narrow tailoring required of content-based restrictions on speech among adults. *See Reno*, 521 U.S. at 844, 117 S.Ct. 2329. More recently, the Child Online Protection Act ("COPA")—representing "congressional efforts to remedy the constitutional defects in the CDA" and targeting commercial speech to minors on the World Wide Web—was also enjoined on First Amendment grounds. *Reno Dist. II*, 31 F.Supp.2d at 476–77.

### a. First Amendment challenge

■ Content-based regulations of protected speech, such as the challenged Act, are presumptively invalid and must withstand strict scrutiny to prevail. *See Sable Communications v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). Significantly, the Supreme Court has emphasized that strict scrutiny applies to content-based regulation of Internet speech. *See Reno*, 521 U.S. at 870, 117 S.Ct. 2329.

The 1999 Act is not narrowly tailored—it effects a total ban on the display of all "electronic file[s] or message[s]," containing "harmful" words, images or sound recordings, that juveniles may "examine and peruse." By prohibiting all such communications that juveniles could possibly examine or peruse, the Act necessarily eliminates access for adults as well. This conclusion follows from the nature of the Internet, as described above. Most speakers on the Internet have no way to determine the age of those who "examine and peruse" their communications. *See Reno Dist.*, 929 F.Supp. at 845. The majority of Web users also cannot segregate or label communications in a way that would block them from the screen for viewing by juveniles. *See Shea v. Reno*, 930 F.Supp. 916, 941 (S.D.N.Y.1996).

This is the critical fact that distinguishes *American Booksellers*, discussed in detail above, from the present case. The pre-amendment version of Code of Virginia § 18.2–391 applied only to traditional media in physical spaces. Under that version of the statute, non-obscene adult materials could be displayed and sold to adults in stores so long as sellers did not "knowingly afford[ ] juveniles an opportunity to peruse harmful materials"—i.e. sexually explicit books could be put on a shelf where their perusal by minors could be monitored but they could still be perused and purchased by adults. *See American Booksellers*, 882 F.2d at 127–28. Therefore, adult communications were not limited to content suitable to children. In the present case, however, as the statute has been amended to address the Internet context, merely using email or participating in a chat room "afford[s] juveniles an opportunity to peruse" potentially "harmful" speech. Internet businesses and individual speakers know that minors can view their materials online; they have no practical way of preventing minors from doing so except to eliminate the materials altogether. Having to choose between self-censorship and the threat of criminal sanctions "unnecessarily interfer[es] with First Amendment freedoms" of adults. *Sable Communications*, 492 U.S. at 126, 109 S.Ct. 2829; *see also Reno*, 521 U.S. at 875, 117 S.Ct. 2329 ("regardless of the strength of the government's interest in protecting children, the level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." (citations omitted)).

Furthermore, the state statutes that have been enjoined by other courts (cited above) have contained more specific language regarding what would constitute a criminal violation under the state statute than the Virginia statute in question here. For example, the New York statute that was enjoined by the court in *American Libraries* makes it a crime for an individual to "intentionally use [ ] any computer . . . to initiate or engage in [ ] communication with a person who is a minor" that "depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and

which is harmful to minors." N.Y. Penal Law § 235.21. Thus, the New York statute is more specific than the Virginia statute, which does not even limit criminal behavior to "communication with a person who is a minor," but prohibits any electronic file or message that is "knowingly display[ed] for a commercial purpose in a manner whereby juveniles may examine or peruse." Va.Code Ann. § 18.2–391. The Michigan statute enjoined by the court in *Cyberspace* and the New Mexico statute, the enjoining of which was upheld by the Tenth Circuit in *Johnson*, are also more narrowly tailored than the Virginia statute and amendments. *See Johnson*, 194 F.3d at 1152; *Cyberspace*, 55 F.Supp.2d at 740. If a court enjoins a more narrowly focused statute such as the New York statute, it follows that the application of the same standards would require the court to enjoin the Virginia statute as well.

The Act also fails the strict scrutiny required of content-based speech because it is not the most effective means of pursuing government's interest in shielding juveniles from "harmful" materials. Under strict, or even intermediate scrutiny, a law "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In the present case, the 1999 Act does not provide the most effective means of preventing juveniles from viewing sexually explicit and harmful materials because, in the context of the Internet, material posted on a computer in another state or overseas is just as available to juveniles and adults as information posted next door.

Further, less restrictive means than the 1999 Act are available to accomplish the state's goal of protecting children from harmful material. Less intrusive and more effective means of limiting online access by children to adult materials are widely available to parents and other users who wish to restrict or block access to online sites, etc., that they feel are inappropriate. First, there are many user-based software products—such as Surf-Watch, CyberPatrol, or NetNanny—that allow users to block access to certain sites, to permit access only to certain sites, to prevent children from giving personal information to strangers by e-mail or in chat rooms, to keep a log of all sites visited by users of a particular computer, or otherwise to monitor juveniles' online activities. *See Reno Dist.*, 929 F.Supp. at 839–40. Second, large commercial online services provide features to block children's access to certain Web content based on keywords, subject matter, or specific newsgroups. Such services also offer screening software that automatically blocks messages containing certain words, and monitoring software that tracks which resources a particular online user within the household has accessed. Third, these online services offer children-only discussion groups that are closely monitored by adults. *See id.* at 842.

These and other widely available user-based tools do not impinge upon adults' rights to send and receive information, while permitting parents and families to tailor minors' access to the Internet based on their own values, child rearing practices, and circumstances including the age and maturity of their children. In addition, unlike the law at issue here, user-based blocking and filtering tools block Web sites or other Internet materials regardless of where in the United States or world the materials are published and distributed, and they block Internet materials regardless of whether the materials are displayed or disseminated by speakers for a commercial purpose. These tools are widely available for free or low cost from ISP's, online, and in stores.

In *Cyberspace*, the Eastern District of Michigan recently relied on such less restrictive means for shielding juveniles from "harmful" materials in striking down the Michigan Internet censorship law similar to the law challenged here. *Cyberspace*,

55 F.Supp.2d at 750–51. That court held that the Michigan Act was "not narrowly tailored, because less restrictive means are available to further Defendants' interests." *Id.* As this is also true with regard to the Virginia statute, the Act should be enjoined on the ground that it fails to satisfy the "least restrictive means" prong of strict scrutiny analysis.

The most obvious contention against the aforementioned solutions, considered by this court to be less restrictive than the Virginia statute, is that the proposed alternatives place the responsibility of protecting minors with individual parents, and not the legislature. While some might applaud such a solution, this court recognizes the continuing interest of both parents and legislatures to protect children. However, legislative efforts of this sort run aground when they impinge too heavily on protected adult speech. Most recently, the Supreme Court struck part of the Telecommunications Act of 1996 for not being the least restrictive means possible of blocking minors' access to pornographic material on cable television. *See Playboy,* 120 S.Ct. at 1886–88. Technological advances are relevant considerations of whether the methods chosen by the government to meet its interests are the least restrictive. *See Reno,* 521 U.S. at 876–77, 117 S.Ct. 2329; *Sable Communications,* 492 U.S. at 130–31, 109 S.Ct. 2829. In a subsequent explanation of its decision in *Reno,* the Court explained, "the mere possibility that user-based Internet screening software would soon be widely available was relevant to our rejection of an overbroad restriction of indecent cyberspeech." *Playboy,* 120 S.Ct. at 1887.

■■■ The challenged Act is also invalid under the First Amendment doctrine of "substantial overbreadth." Under this doctrine, a law regulating speech must be struck down as invalid if it would "penalize a substantial amount of speech that is constitutionally protected," even if "some applications would be 'constitutionally unobjectionable.'" *Reno Dist.,* 929 F.Supp. at

867 (quoting *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 129–30, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)). The 1999 Act provides no way for Internet speakers to prevent their communications from reaching minors without also denying adults access to the material. As a result, any application of the Act to prevent display of the category of speech that it was enacted to regulate—nonobscene adult materials—would directly contradict the First Amendment. The Act is also overbroad because it infringes on the rights of adults in communities outside of Virginia. The Act thus "sweeps too broadly" and must be enjoined. *See Forsyth County,* 505 U.S. at 130, 112 S.Ct. 2395.

### b. Commerce Clause challenge

The plaintiffs also contend that the Act must be struck down because it contravenes the Commerce Clause. *See* U.S. Const. Art I, § 8, cl. 3. Although this court need not address the Commerce Clause arguments, as the likelihood of success on the First Amendment claim is sufficient to carry the day, the Commerce Clause will be discussed in brief.

■■■ The negative implication of the Commerce Clause, U.S. Const. Art I., § 8, cl. 3, includes a prohibition on state regulation that "discriminates against or unduly burdens interstate commerce" and thereby "imped[es] free private trade in the national marketplace." *General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (citing and quoting *Reeves, Inc. v. Stake,* 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)); *see also South Central Bell Telephone Co. v. Alabama,* 526 U.S. 160, 170–71, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999) (declining invitation to abandon negative commerce clause jurisprudence). The Virginia Code § 18.2–391 unduly burdens interstate commerce by placing restrictions on electronic commercial materials that impede the communication of said materials in all states, not just Virginia. For example, an Internet website owner in

California whose website is visited by a minor in Virginia could be subject to Virginia law. Because there is currently no way to limit access to online materials by geographic location, the California website owner would have to alter his commercial materials in all states in order to comply with the rigors of the Virginia statute. Thus, § 18.2–391 constitutes an undue burden on interstate commerce because it attempts to regulate commercial conduct wholly outside of Virginia's borders. *See, e.g. Johnson,* 194 F.3d at 1160–61 (finding same with New Mexico statute); *American Libraries,* 969 F.Supp. at 168–83 (same).

Furthermore, § 18.2–391 potentially subjects citizens to inconsistent state regulations, thereby also placing an undue burden on interstate commerce. This potential hazard of inconsistent Internet regulation by individual states begs Congress to declare this area as one of the few that, based on the need for national uniformity, are reserved for regulation by a single authority. *See American Libraries,* 969 F.Supp. at 169; *see, e.g., Southern Pac. Co. v. State of Ariz. ex rel. Sullivan,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (citations omitted) (striking Arizona state law restricting train length as an undue impediment to interstate commerce).

The nature of the Internet and the text of § 18.2–391 itself preclude any interpretation of the statute that it only serves to regulate intrastate behavior. *See Johnson,* 194 F.3d at 1161, *American Libraries,* 969 F.Supp. at 169. This conclusion, combined with the aforementioned restrictions imposed by § 18.2–391 lead this court to find that the plaintiffs have shown a substantial likelihood of success on the merits of their claim that § 18.2–391 violates the Commerce Clause.

*4. Public Interest*

■ In addition to the other factors for determining whether to grant a preliminary injunction, the public interest must always be considered. *See Blackwelder,* 550 F.2d at 196. Although there is a public interest in protecting juveniles from harmful materials, that legitimate interest cannot justify broad suppression of adult speech, which would reduce the speech of the adult population to that which is suitable for children. *See Reno,* 521 U.S. at 875, 117 S.Ct. 2329 (citations omitted). Furthermore, as the court has found that the plaintiffs have a substantial likelihood of success on the merits of their two constitutional challenges to the statute, the public does not have an interest in upholding an unconstitutional statute. *See Reno Dist.,* 929 F.Supp. at 866. "It is well established that no one, the government included, has an interest in the enforcement of an unconstitutional law." *Reno Dist. II,* 31 F.Supp.2d at 497–98 (citations omitted). Enjoining the statute will serve the public interest because it will prevent enforcement of a statute which, as amended, places unconstitutional restrictions on the free expression of the millions of Internet users both within and outside the state. *See Cyberspace,* 55 F.Supp.2d at 754.

### IV.

Having found that (1) the plaintiffs have standing to bring this motion, and (2) the plaintiffs prevail in the four-factor balancing test for determining whether to issue a preliminary injunction, the plaintiffs' motion for preliminary injunction shall be GRANTED.

An appropriate order shall this day enter.